# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| In re: | Chapter 7 |
| CENTRAL GROCERS, INC., *et al.*, | Case No.  17-13886 (Jointly Administered) |
| Debtors. | Hon.  Pamela S. Hollis |
| HOWARD B. SAMUELS, solely as chapter 7 trustee of the estates of CENTRAL GROCERS, INC., *et al.*,[1] | |
| Plaintiff, | |
| v. | Adversary No.  _____ |
| JOHN COARI, JOHN CORTESI, ANTHONY DAL PRA, JAMES DREMONAS, TONY INGRAFFIA, MARIA KAMBEROS, JOHN KOTARA, TIMOTHY KUBIS, JOSEPH KUMKOSKI, FRANK KUMKOSKI, JOHN LAGESTEE, KERRY LAVELLE, ROBERT LEE, ALFREDO LINARES, KENNETH NEMETH, ROBERTINO PRESTA, JOHN REGAS, JAMES ROBERTSON, JOHN SULLIVAN and LAVELLE LAW, LTD., | **Jury Trial Demanded** |
| Defendants. | |

## ORIGINAL COMPLAINT

---

[1] The Debtors in these Chapter 7 cases, along with the last four of each debtor's federal tax identification number, as applicable, are Central Grocers, Inc. (3170), Strack and Van Til Super Market, Inc. (2184), and SVT, LLC (1185).

## TABLE OF CONTENTS

SUMMARY OF ACTION ...............................................................................................1

JURISDICTION AND VENUE ...................................................................................4

PARTIES ...................................................................................................................5

FACTUAL BACKGROUND........................................................................................8

    A.    CGI Sold Wholesale Groceries to Members and Owned its Largest
        Customer ......................................................................................8

    B.    Mismanagement and External Factors Drove CGI Into Insolvency ....................10

    C.    CGI's 2015-2016 Liquidation Attempt Failed .......................................13

    D.    The CGI Appointees Refused to Pursue a Sale of SVT Untethered
        to a Long-Term Purchasing Contract ..................................................16

    E.    CGI Insiders Caused CGI to Improperly Redeem Insiders'
        Class B Shares..........................................................................19

    F.    The CGI Directors Further Enriched Their Stores Through
        an Improper Rebate....................................................................22

    G.    The CGI Directors, Kubis, and Nemeth Failed to Require
        Members to Maintain Their Buying Deposit Accounts ....................................25

    H.    CGI Became Insolvent by August 2016 at the Latest...........................................28

CAUSES OF ACTION ...............................................................................................29

    Count 1 – Breach of Fiduciary Duty of Care: Failure to Sell SVT................................29

    Count 2 – Breach of Fiduciary Duty of Loyalty: Failure to Sell SVT .............................30

    Count 3 – Breach of Fiduciary Duty:  Kubis Stock Redemption ....................................31

    Count 4 – Avoidance of Fraudulent Transfers: Kubis Stock Redemption
    11 U.S.C.  § 548(a)(1)(B) ...........................................................................33

    Count 5 – Avoidance of Fraudulent Obligations: Kubis Stock Redemptions
    11 U.S.C. § 544(b)(1), 740 ILCS 160/5(a)(2) and 740 ILCS 160/6(a)  ..........................35

    Count 6 – Avoidance of Fraudulent Transfers: Kubis Stock Redemptions
    11 U.S.C.  § 548(a)(1)(A) ...........................................................................36

Count 7 – Avoidance of Fraudulent Transfers: Kubis Stock Redemptions
11 U.S.C. § 544(b) and 740 ILCS 160/5(a)(1) ................................................37

Count 8 – Breach of Fiduciary Duty: Coari Stock Redemption ......................38

Count 9 – Avoidance of Fraudulent Transfers: Coari Stock Redemption
11 U.S.C. § 548(a)(1)(B) ................................................................................39

Count 10 – Avoidance of Fraudulent Obligations: Coari Stock Redemption
11 U.S.C. § 544(b)(1), 740 ILCS 160/5(a)(2) and 740 ILCS 160/6(a) .........40

Count 11 – Avoidance of Fraudulent Transfers: Coari Stock Redemption
11 U.S.C. § 548(a)(1)(A) ................................................................................41

Count 12 – Avoidance of Fraudulent Transfers: Coari Stock Redemption
11 U.S.C. § 544(b) and 740 ILCS 160/5(a)(1) ...............................................41

Count 13 – Breach of Fiduciary Duty: Kumkoski Stock Redemptions ...........42

Count 14 – Avoidance of Fraudulent Transfers: Kumkoski Stock
Redemptions - 11 U.S.C. § 548(a)(1)(B) .......................................................43

Count 15 – Avoidance of Fraudulent Obligations: Kumkoski Stock
Redemptions - 11 U.S.C. § 544(b)(1), 740 ILCS 160/5(a)(2)
and 740 ILCS 160/6(a) ...................................................................................44

Count 16 – Avoidance of Preferential Transfers - 11 U.S.C. § 547 ...............44

Count 17 – Recovery of Avoided Transfers - 11 U.S.C. § 550(a) ..................46

Count 18 – Breach of Fiduciary Duty: Improper Rebate ................................48

Count 19 – Improper Distribution - 805 Ill. Comp. Stat. Ann. 5/9.10 ...........49

Count 20 – Breach of Fiduciary Duty: Underfunded Buying Deposit
Accounts .........................................................................................................49

Count 21 – Equitable Subordination - 11 U.S.C. § 510(b) .............................51

Count 22 – Objection to Claim – Cortesi .......................................................52

Count 23 – Objection to Claim – Dremonas ...................................................52

Count 24 – Objection to Claim – Ingraffia .....................................................53

Count 25 – Objection to Claim – Kamberos ..................................................................53

Count 26 – Objection to Claim – Kotara ......................................................................53

Count 27 – Objection to Claim – Lagestee ...................................................................54

Count 28 – Objection to Claim – Lee ...........................................................................54

Count 29 – Objection to Claim – Linares .....................................................................54

Count 30 – Objection to Claim – Presta .......................................................................55

Count 31 – Objection to Claim – Regas ........................................................................55

Count 32 – Objection to Claim – Robertson .................................................................55

CONDITIONS PRECEDENT ............................................................................................56

TOLLING OF LIMITATIONS ...........................................................................................56

JURY DEMAND ..................................................................................................................56

Howard B. Samuels (the "Trustee"), solely in his capacity as Chapter 7 trustee for the bankruptcy estates of Central Grocers, Inc. ("CGI"), Strack and Van Til Super Market, Inc. ("Strack"), and SVT, LLC ("SVT") (collectively, the "Debtors"), pursuant to Federal Rule of Bankruptcy Procedure 7001, hereby brings this adversary proceeding against John Coari, John Cortesi, Anthony Dal Pra, James Dremonas, Tony Ingraffia, Maria Kamberos, John Kotara, Timothy Kubis, Joseph Kumkoski, Frank Kumkoski, John Lagestee, Kerry Lavelle, Robert Lee, Alfredo Linares, Kenneth Nemeth, Robertino Presta, John Regas, James Robertson, John Sullivan, and Lavelle Law, Ltd. (collectively, "Defendants"), and alleges as follows:

## SUMMARY OF ACTION

1.      CGI's former directors ignored or consciously disregarded their fiduciary duties to CGI because of a fundamental misalignment of interests. Every CGI director owned and/or managed retail grocery stores that were CGI customers. The directors were thus, in effect, CGI's customers, and they treated CGI like a buying club that existed solely to provide their stores with groceries at the cheapest price, rather than like a legal corporate entity with rights and interests independent from their own interests in acquiring cheap groceries. The directors treated SVT—CGI's retail subsidiary—as simply a tool to leverage lower prices for their stores, regardless of what was in SVT's best interests. The officers acted to advance their own interests and the directors' interests, not the Debtors'. The Defendants' conflicted decisions, gross negligence, and conscious disregard for the Debtors' interests cost the Debtors' tens of millions of dollars in damages.

2.      For nearly 100 years, CGI was a successful grocery cooperative, selling wholesale grocery products to retail grocery stores. However, CGI began a decline in 2015 that accelerated through 2016 and early 2017 until its May 2, 2017, involuntary bankruptcy. The Debtors filed

1

voluntary petitions two days later, and they now face hundreds of millions of dollars in creditor claims they can never repay.  The Defendants no longer control the Debtors.  Instead, vested with the authority to pursue the Debtors' legal claims, the Trustee brings this lawsuit to remedy the Defendants' misconduct for the benefit of the Debtors' creditors.

3.      The Defendants damaged the Debtors in multiple ways.  First, just seven months before CGI's bankruptcy, and in the face of unprecedented losses, corporate layoffs, and debt covenant defaults, CGI's directors approved payment of a massive "patronage rebate" (really, a dividend) from CGI to CGI's members, including the directors' own retail grocery businesses.  Instead of investing in CGI's business, paying down debt, or retaining cash to pay creditors, the directors prioritized their own interests above those of CGI and its creditors and approved CGI's payment of tens of millions of dollars in rebates to members.

4.      Second, CGI's directors failed to require CGI's customers (including the directors' stores) to maintain their buying deposit accounts in accordance with CGI's by-laws and corporate rules.  CGI ostensibly required its customers to maintain buying deposits which CGI could look to if a customer failed to pay for the grocery products the customer purchased.  Because the customers' buying deposit accounts were woefully underfunded, when CGI's customers failed to pay the amounts they owed upon CGI's bankruptcy, CGI was left with millions of dollars in unpaid and likely uncollectible accounts receivable.  CGI's directors failed to cause CGI to undertake any significant efforts to see that the customers' buying deposits were fully funded, and many of the directors' stores' buying deposits were deficient.  The CGI directors' failure to require customers to maintain their buying deposit accounts has resulted in CGI being unable to collect on millions of dollars of unpaid accounts receivable.  CGI officers Ken Nemeth—the company's CEO—and

Tim Kubis—its CFO—are also liable for this damage to CGI because they failed to take steps to require customers to fulfill their buying deposits.

5.      Third, certain CGI officers and the CGI board chairman caused the redemption of corporate stock at a highly inflated price and in violation of CGI's by-laws.  Knowing the company was in financial turmoil, these officers sought and approved over $3 million in stock redemptions. Some of the officers benefited personally from the redemptions, while other officers and the board chairman were grossly negligent in approving them.  The Trustee brings breach-of-fiduciary-duty claims against the directors and officers responsible for these payments, and fraudulent transfer claims against the recipients of the payments.[2]

6.      Fourth, the CGI-appointed directors of Strack—Defendants Nemeth, Kotara, and Lavelle (together, the "CGI Appointees")—abused Strack and SVT for the benefit of the CGI directors' stores.  Strack owned and managed SVT, CGI's retail subsidiary, and CGI had the right to appoint a majority of the members of the Strack board of directors.  In breach of their fiduciary duties to Strack, the CGI Appointees refused to pursue a sale of SVT in April 2016 despite the urgings of Strack's minority shareholders and despite clear evidence that doing so was in Strack's best interests.  The CGI Appointees blocked the sale to ensure that SVT would continue purchasing groceries from CGI, which would benefit CGI's customers—even though a sale in April 2016 would have yielded enough money to pay all Strack's creditors *and* compensate its shareholders. Because SVT's performance continued to decline after April 2016, the SVT retail stores ultimately sold in bankruptcy for far less than SVT's outstanding liabilities, leaving tens of millions of dollars in unpayable creditor claims because the CGI Appointees willfully or recklessly neglected Strack's interests.

---

[2]   The Trustee also seeks to avoid and recover preferential transfers made to CGI's outside general counsel.

3

7.      Finally, the Trustee seeks to equitably subordinate the claims asserted against the Debtors' estates for the benefit of the directors because their abandonment and neglect of their fiduciary duties contributed to CGI's financial calamity.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(b) because it: (a) arises in and relates to the above-captioned bankruptcy case (the "Bankruptcy Case"), which was commenced on May 2, 2017 (the "Petition Date") under title 11 of the United States Code (the "Bankruptcy Code"); and (b) arises under the Bankruptcy Code. The Trustee brings core and non-core claims in this adversary proceeding.

9.      This Court is the proper forum to hear these claims pursuant to Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois.

10.      The Court has personal jurisdiction over each of the Defendants in this proceeding because: (a) the Defendants have sufficient contacts with the United States of America to be subject to nationwide service of process under Federal Rule of Bankruptcy Procedure 7004; and (b) the Defendants, through their continuous and systematic contacts with the State of Illinois, have purposefully availed themselves of the benefits of its laws and should reasonably anticipate being haled into court in Illinois.

11.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

12.      The Trustee consents to the entry of a final order or judgment by this Court if it is determined that the Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III of the United States Constitution with respect to any of the requests for relief set forth in this Complaint.

## PARTIES

13.     Plaintiff Howard B. Samuels is an individual and a citizen of the State of Illinois. He serves as the Chapter 7 trustee for the bankruptcy estates of CGI, Strack, and SVT.

14.     Defendant John Coari is an individual and a citizen of the State of Illinois.  He was CGI's Chief Operating Officer from at least January 2014 to July 2016.  He may be served with process at 24224 S. Indian Trail, Manhattan, IL 60442.

15.     Defendant John Cortesi is an individual and a citizen of the State of Illinois.  He was one of CGI's directors from at least January 2014 to April 2017.  He may be served with process at 777 Central Avenue, Highland Park, IL 60035.

16.     Defendant Anthony Dal Pra is an individual and a citizen of the State of Illinois. He was one of CGI's directors from at least January 2014 to April 2017.  He may be served with process at 11387 Cross Creek Estates Lane, Belvidere, IL 61008.

17.     Defendant James Dremonas is an individual and a citizen of the State of Illinois. He was one of CGI's directors from at least September 2014 to April 2017.  He may be served with process at 128 Oak Ridge Drive, Burr Ridge, IL 60527.

18.     Defendant Tony Ingraffia is an individual and a citizen of the State of Illinois.  He was one of CGI's directors from at least January 2014 to April 2017.  He may be served with process at 3607 W. Fullerton, Chicago, IL 60647.

19.     Defendant Maria Kamberos is an individual and a citizen of the State of Illinois. She was one of CGI's directors from at least January 2014 to April 2017.  She may be served with process at 3460 N Broadway, Chicago, IL 60647.

20.     Defendant John Kotara is an individual and a citizen of the State of Illinois.  He was one of CGI's directors, as well as the Chairman of its board of directors, from at least January

2014 to April 2017.  He also served as one of Strack's directors from at least June 2014 to April 2017.  He may be served with process at 19400 Hunter Trail, Mokena, IL 60448.

21.     Defendant Timothy Kubis is an individual and a citizen of the State of Illinois.  He was CGI's Chief Financial Officer from at least January 2014 to July 2016.  He also served as the company's "CFO Consultant" from at least July 2016 to April 2017.  He may be served with process at 540 W. Webster Ave., Unit 304, Chicago, IL 60614.

22.     Defendant Joseph Kumkoski is an individual and a citizen of the State of Illinois.  He was one of the owners of Westbrook Market, which held Class A shares and Class B shares in CGI.  He may be served with process at 6818 Fairview Ave., Downers Grove, IL 60516.

23.     Defendant Frank Kumkoski is an individual and a citizen of the State of Illinois.  He was one of the owners of Westbrook Market, which held Class A shares and Class B shares in CGI.  He may be served with process at 6734 Fairview Ave., Downers Grove, IL 60516.

24.     Defendant Kerry Lavelle is an individual and a citizen of the State of Illinois.  He was CGI's outside general counsel from at least January 2014 to April 2017.  He also served as one of Strack's directors from at least November 2013 to April 2017.  He may be served with process at Lavelle Law Ltd., 1933 N. Mecham Road, Suite 600, Schaumburg, IL 60173.

25.     Defendant John Lagastee is an individual and a citizen of the State of Indiana.  He was one of CGI's directors from at least January 2014 to April 2017.  He may be served with process at 530 Pinehurst Lane, Schererville, IN 46375.

26.     Defendant Robert Lee is an individual and a citizen of the State of Illinois.  He was one of CGI's directors from at least January 2014 to April 2017.  He may be served with process at 2119 Liberty Lane, Peru, IL 61354.

6

27.     Defendant Alfredo Linares is an individual and a citizen of the State of Illinois.  He was one of CGI's directors from at least January 2014 to April 2017.  He may be served with process at 355 Uvedale Road, Riverside, IL 60546.

28.     Defendant Kenneth Nemeth is an individual and a citizen of the State of Texas.  He was one of Strack's directors from at least November 2013 to April 2017.  He also served as CGI's Chief Executive Officer from at least February 2014 to April 2017.  He may be served with process at 3424 W. Biddison Street, Fort Worth, TX 76109.

29.     Defendant Robertino Presta is an individual and a citizen of the State of Illinois.  He was one of CGI's directors from at least January 2014 to April 2017.  He may be served with process at 520 E. North Ave, Carol Stream, IL 60188.

30.     Defendant John Regas is an individual and a citizen of the State of Illinois.  He was one of CGI's directors from at least January 2014 to April 2017.  He may be served with process at 4640 S. Halsted, Chicago, IL 60609.

31.     Defendant James Robertson is an individual and a citizen of the State of Illinois.  He was one of CGI's directors from at least January 2014 to April 2017.  He may be served with process at 14110 Cristina Ave, Orlando Park, IL 60462.

32.     Defendant John Sullivan is an individual and a citizen of the State of Illinois.  He was one of CGI's directors from at least January 2014 to April 2017.  He may be served with process at 1300 Reusch Road, Elizabeth, IL 61028.

33.     Defendant Lavelle Law, Ltd. ("Lavelle Law") is an Illinois corporation.  It may be served with process through its registered agent, Theodore McGinn, at 1933 N. Mecham Road, Suite 600, Schaumburg, IL 60173.

7

## FACTUAL BACKGROUND

**A.     CGI Sold Wholesale Groceries to Members and Owned its Largest Customer.**

34.     CGI was a grocery co-operative.   Its customers were grocery retailers that purchased groceries at wholesale from CGI.  CGI referred to its customers as "Members."  Each CGI director was an owner, officer, or representative of a Member.  As of September 2016, the CGI board of directors (the "CGI Board) included the following persons (collectively, the "CGI Directors"):

- John Kotara (of Berkot's Super Foods);
- John Cortesi (of Sunset Foods);
- Anthony Dal Pra (of Pacemaker);
- James Dremonas (of Pete's Fresh Market);
- Tony Ingraffia (of Tony's Finer Foods);
- Maria Kamberos (of Treasure Island);
- John Lagestee (of Walt's Food Centers);
- Robert Lee (of Spring Valley Supermarket);
- Alfredo Linares (of La Chiquita Foods);
- Robertino Presta (of Caputo's Fresh Markets);
- John Regas (of Fairplay Finer Foods);
- James Robertson (of Fairway Foods); and
- John Sullivan (of Sullivan's Foods).

35.     CGI had three aspects to its business: (a) its wholesale grocery business; (b) its retail grocery business, through its retail subsidiary; and (c) ownership of real estate related to its wholesale and retail businesses.

36.     As to its wholesale business, CGI bought grocery products from suppliers and sold them to the Members.  CGI distributed profits from its wholesale operations to the Members through annual dividends known as "patronage dividends" or "patronage rebates."  At the end of the fiscal year, the CGI Board determined the total rebate that the company would pay its Members (including the Members each director owned or managed).  Specifically, under its corporate by-laws, CGI would

> distribute to qualifying Members as Patronage Rebates all of the Corporation's
> Rebateable Net Income in excess of such reserves, payment of debts, capital
> improvements or additions, and working capital requirements as the Board of
> Directors may from time to time determine.

The amount of each Member's rebate depended on the amount and type of goods that the Member purchased from CGI during the prior year.

37.     As to retail, CGI owned 81% of Strack, which was the 99% owner of retail grocer SVT. SVT operated stores under different banners: (a) Strack &Van Til, which was a traditional grocery store; and (b) Ultra Foods and Town & Country (collectively, "Ultra"), which were big-box discount grocery stores. SVT was CGI's largest customer. SVT accounted for roughly 40% of CGI's sales in the years before the Debtors' bankruptcy filing.

38.     CGI held not only a controlling interest in Strack, but also a controlling position on Strack's board of directors. Under a Shareholder Agreement dated December 13, 1990, CGI had the power to appoint three members of Strack's five-member board of directors (the "Strack Board"), while Strack's minority shareholders had the power to appoint the remaining two board members (the "Minority Appointees"). From at least June 2014 to April 2017, the members of the Strack Board were:

- John Kotara (a CGI Appointee);
- Karry Lavelle (a CGI Appointee);
- Ken Nemeth (a CGI Appointee);
- Andrew Raab (a Minority Appointee); and
- Jeffrey Strack (a Minority Appointee).

39.     CGI also owned real estate. CGI owned several properties where SVT operated retail stores through a subsidiary, Raceway Central. CGI categorized its investments in Strack and Raceway Central as "non-patronage assets," meaning they were involved in the retail side of CGI's business, not the wholesale side. CGI also owned a large distribution center through a subsidiary, Raceway Joliet.

40.     CGI had two classes of shareholders.  Upon joining the cooperative, each Member purchased Class A shares at a nominal par value.  Class A shares provided the right to elect CGI's directors, but, unlike typical corporate stock, Class A shares represented only a nominal interest in CGI's equity structure.   CGI distributed profits from "patronage activities" (its wholesale operations) to Class A shareholders based on their purchase volume.

41.     CGI also issued Class B shares.  The value of the Class B shares derived from the equity that CGI accumulated from its non-patronage activities, including its ownership of Strack and Raceway Central.  Like traditional stock, Class B shares represented an ownership interest in CGI's assets.   Class B shareholders included current and former Members and some CGI employees.

42.     Members could acquire Class B stock by foregoing a portion of their annual patronage rebate.  Relevant here, Joseph and Frank Kumkoski, the owners of Member Westbrook Market, acquired substantial Class B holdings prior to 2016.  Until 2008, CGI also issued Class B shares to certain employees as a form of compensation.  CFO Kubis and John Coari, CGI's Chief Operating Officer, each acquired substantial Class B holdings prior to 2016.

**B.     Mismanagement and External Factors Drove CGI Into Insolvency.**

43.     CGI was a successful cooperative for many years.  A group of grocery store owners seeking to achieve better pricing by pooling their market leverage founded CGI in 1917.  It grew to become the largest food cooperative in Chicago, and in 2015 was the seventh-largest grocery cooperative in the United States with $2 billion in consolidated annual sales.  Unfortunately, its business began to falter in 2015 then declined precipitously in 2016 and 2017.

44.     CGI failed largely because SVT's sales declined between 2015-2017.  SVT was CGI's indirect subsidiary and largest customer.  For many years, Strack proved a prudent investment for CGI, and SVT earned healthy profits.  By adding SVT as a dedicated customer,

10

CGI increased its own sales volume, which allowed CGI to demand more favorable pricing from suppliers.  This improved CGI's margins and enhanced Member rebates.

45.      By 2015, however, market conditions changed.  General, high-volume retailers like Target and Wal-Mart gained a significant share of the retail grocery market, as did Amazon and other online sellers.  SVT's big-box Ultra stores struggled to compete with these new market entrants.  SVT's overall performance declined.

46.      Part of this sales decline was self-inflicted.  On October 9, 2014, Strack hired Ken Diehl to be SVT's CEO in reaction to already declining sales at SVT.  Diehl's tenure was a disaster. He raised SVT's prices to increase EBITDA.  The price increase temporarily increased EBITDA, but it reduced sales across SVT's stores, particularly at the Ultra stores, where particularly cost-conscious shoppers shopped.   He also clashed with SVT's existing upper- and middle-management, causing an employee exodus.  SVT lost valuable institutional knowledge when many executives quit, and more than 250 store-level management positions turned over.

47.      In addition, the Ultra stores had lagged behind the market in upkeep.  Newer, more modern entrants to the market were more attractive to customers.  CGI and SVT failed to remodel the SVT stores to keep up with the competition, further contributing to declining sales.

48.      The decline at SVT was no secret to the CGI Directors.  At CGI Board meetings, SVT and CGI management reported on SVT's declining performance:

- February 24, 2015:  SVT sales were down approximately 2.3% from the prior quarter.

- May 14, 2015:  SVT sales were at 92% of projection, down 6.8% for the quarter, and down 3.4% year-to-date.

- July 9, 2015:  SVT sales were down 10.5% from the prior year.

- September 17, 2015:  SVT sales missed budget for the fourth quarter by approximately 11.5% and missed budget for the year by 6%.

- December 10, 2015:  SVT sales were down 9% for the first quarter, as compared to the same quarter a year ago.  These sales decreases were described as "dramatic."

- February 11, 2016:  SVT sales were down 13.3% from the prior quarter and down 13.4% year-to-date.

- April 21, 2016:  SVT sales were down 13.5% year-to-date.

- May 11, 2016:  SVT sales were down 8.2% for the third quarter and 7% year-to-date.

- July 14, 2016: SVT sales were down 11% for the fourth quarter.

- September 15, 2016:  SVT sales were down 12.4% for the quarter and 13.6% year-to-date.

- December 8, 2016:  SVT sales were down 11% for the first quarter, as compared to the first quarter from the prior year.

- February 9, 2017:  SVT sales were down 8% from the prior quarter.

49.     As early as January 2015, Kerry Lavelle, CGI's outside general counsel, and CFO Kubis commiserated over SVT's struggles.  After reviewing one set of reports, Lavelle wrote: "These numbers are too depressing."  In February 2016, when SVT's aggregate sales were down nearly 15% from the prior year, Lavelle quipped: "When is this going to end?!?" and "Ouch." Things got even worse for SVT in March 2016, when Lavelle described the results as "Brutal" and wrote to Kubis, "Yikes, not good."

50.     Strack fired Diehl in May 2016 and hired minority shareholder Jeff Strack as CEO. Strack's efforts to reduce the sales decline at SVT were inadequate or implemented too late to save Strack and CGI.  SVT's sales continued to decline, even with Jeff Strack at the helm.

51.     CGI's Directors did virtually nothing to try to stop the decline.  They generally saw the declines at SVT as a Strack problem, not a CGI problem.  But it was the sales decline at CGI's largest customer that ultimately caused CGI's bankruptcy.

52.     SVT's decline doubly impacted CGI.  When SVT's sales declined, so did CGI's margins, owing to its substantial fixed costs.  Decreasing margins meant lower patronage rebates for the Class A shareholders.  The Class B shareholders—who held the equity value of SVT—suffered as well because the value of their shares declined.

53.     The decline in SVT purchases caused a decline in CGI's cash flow.  The decline in cash flow caused CGI to become out-of-compliance with one of its loan covenants in September 2016.  To remedy this non-compliance, in October 2016, CGI's lenders required CGI to "rebate" less money to its Members.  Once the banks required CGI to rebate less money to Members to remain in compliance with loan covenants, the rate at which Members reduced their purchases from CGI increased.  This worsened CGI's cash crunch, and eventually it exhausted its credit with the banks, resulting in its May 2, 2017, involuntary bankruptcy.

**C.     CGI's 2015-2016 Liquidation Attempt Failed.**

54.     Amid the havoc at SVT, the CGI Directors, Nemeth, and Kubis pursued a liquidation of the business and a transition of the Members to another wholesaler.  The CGI Directors did not seek a liquidation to address the ongoing situation at SVT or to protect CGI's creditors.  Rather, they sought a liquidation to benefit their own businesses.  They believed they could obtain better pricing on retail groceries for their stores from a different wholesaler, so they sought an exit plan that would allow them to transition to another wholesaler while extracting as much of CGI's value as possible.  This attempt failed.  But their results of their efforts demonstrated that CGI and SVT were unmarketable together.

55.     CGI CEO Nemeth identified Associated Wholesale Grocers, Inc. ("AWG"), another co-operative wholesaler based in Kansas City, as a potential replacement wholesaler for the CGI Members.  After several months of preliminary discussions, AWG proposed an acquisition of certain CGI assets, primarily including CGI's distribution center, which proposal Nemeth first

13

presented to the board of directors in August 2015.  An AWG acquisition of the distribution center would give AWG a sufficient base to supply the CGI Members.

56.     AWG eventually offered to purchase CGI's wholesale business, including the distribution center, for $199 million.  As a condition, AWG stipulated that $60 million of the purchase price would go to CGI's Members that transitioned to AWG.  AWG required this payment because CGI had no supply contracts with its Members and therefore had no way to ensure the non-SVT Members would patronize AWG after the acquisition.  The $60 million would be a lure to attract the CGI Members to transition to AWG.  The CGI Directors generally supported this arrangement as it allowed them to extract value from CGI while transitioning to a cheaper wholesaler.

57.     But the CGI Directors faced the problem of what to do with SVT.  SVT was, at once, the albatross around CGI's neck and the key to any liquidation acceptable to the CGI Directors.  CGI only had one customer it could commit to a new wholesaler—SVT.  But as discussed, SVT's business was in decline.  The sale of the distribution center alone would not bring in enough money to discharge CGI's debts (particularly as $60 million would be paid to lure Members to AWG).  Exiting the wholesale business but keeping SVT was not a real option for CGI.  The CGI Directors saw CGI as just a means to obtaining groceries for their stores, not as a corporate operator of retail stores.  Moreover, particularly given SVT's financial condition, SVT alone could not carry CGI's debt burden.

58.     So, to consummate a deal with AWG, CGI had to sell SVT.  AWG would not purchase SVT, but it required SVT to enter into a 15-year supply and distribution agreement with AWG.  If SVT were not committed, the distribution center might not have sufficient business.  This requirement made SVT almost unmarketable because the most natural potential purchasers

14

of a grocery retail chain would want SVT to purchase from their own supplier.  And on top of the supply agreement requirement, as noted, SVT's financial condition was deteriorating.

59.     CGI's directors and officers, with the support of an investment advisor (The Food Partners, LLC ("The Food Partners")), tried for months to find a buyer for SVT.  The best they could find was an expression of interest from Marsh, LLC ("Marsh"), which owned another chain of grocery stores, to go along with the AWG transaction.  However, The Food Partners did not market SVT to the most natural buyers of a retail grocery chain—such as Kroger's and Albertson's.  This was because Kroger's and Albertson's would want SVT to purchase wholesale groceries from their suppliers, not from AWG.  But AWG would not purchase the distribution center without a long-term commitment from SVT.

60.     On April 21, 2016, The Food Partners presented the potential transaction with AWG and Marsh to the CGI Board.  The Food Partners' analysis showed that a completed acquisition with Marsh acquiring SVT and AWG acquiring CGI's wholesale business would result in all of CGI's debts being paid and a return of $34 to Class B shareholders.

61.     Unfortunately, the CGI Board determined at the April 21, 2016, meeting to abandon efforts to close a transaction with any wholesaler and retailer.  $34 per share was not enough for them.  This was an ironic decision given that CGI's insolvency and subsequent bankruptcy just over one year later rendered those Class B shares completely worthless and left CGI owing unsecured creditors tens of millions of dollars.

62.     Faced with their inability to find transaction partners suitable to the CGI Board, and faced with CGI's and SVT's declining performances, CGI Director Lagastee asked the full board, "Is this Company beyond repair?"

### D.    The CGI Appointees Refused to Pursue a Sale of SVT Untethered to a Long-Term Purchasing Contract.

63.    Throughout CGI's efforts to sell SVT (recounted above), the CGI Appointees to the Strack Board were charged with pursuing the best interests of Strack, yet they single-mindedly pursued the interests of CGI's other Members, instead.   In October 2015, Strack's Minority Appointees warned the CGI Appointees by letter that they were in a conflicted position:

> In the context of a sale transaction, each member of the Board of Directors of [Strack] has significant fiduciary duties to the shareholders and the members of [Strack].  The members of the Board must act in the best interests of all constituent owners and not in the interests of only certain owners, such as in a manner designed to preserve supplier or vendor relationships.  The duty is to maximize shareholder value for all shareholders and ensure that the sale process is fair and maximizes value for all seller constituents and is not biased in a manner that favors a particular bidder.
>
> At a minimum, there is the strong appearance of conflicts of interest between certain of the members of the [Strack] Board and the interests of [Strack] and at least certain of its shareholders.  Three of the five members of the Board are appointed by [CGI], which is the principal supplier to [Strack] and [SVT].  … Conflicts of interest also create a heightened concern that the Board take all reasonable steps to secure the highest price for the business of [Strack] and [SVT].
>
> … I urge you to take the steps that any well-counseled fiduciary would take under the circumstances: establish an independent committee to consider, review and approve (or not) any proposed transaction, hire distinct and otherwise disinterested investment banking and legal professionals separate from those engaged on behalf of the [CGI] transaction for the spin off transaction and engage professional to prepare a fairness opinion.  Please ensure that all of your fiduciary duties including the duties of care, loyalty and disclosure are fully satisfied.

64.    Unfortunately, the CGI Appointees did not heed this warning.  CGI proceeded to enter a letter of intent with AWG that contemplated a transaction detrimental to Strack's interests because it would tie SVT to a long-term contract with AWG.  The Minority Appointees informed the CGI Appointees that the contemplated transaction was not in Strack's best interests in a January 5, 2016 email:

> The LOI contains numerous matters which are objectionable to [Strack], and by your and AWG's financial advisor's admissions, impairs the value of [Strack].

These objectionable matters include, among many other items, a veto right for
AWG on any potential sale of [Strack], an onerous 15 year Supply Agreement
between [Strack] and AWG … and use restrictions for SVT stores requiring AWG
as supplier.  We have repeatedly expressed our concern about the conflicts of
interest among the various constituents of CGI and [Strack].  Despite our repeated
requests since October, [Strack] has not hired or considered hiring an independent
financial advisor.  The Board of [Strack] is therefore unable to determine at this
time what is in the best interests of the shareholders of [Strack].

65.    The Minority Appointees strongly opposed AWG's proposed acquisition of the

wholesale business "without knowing the financial impact of [the] 15-year supply contract"

included in AWG's proposal.  At a February 2016 Strack Board meeting, the Minority Appointees

moved for SVT to hire its own financial advisor to "make sure the marketing job of the Food

Partners [was] being done in a manner to maximize value for SVT."  The CGI Appointees

eventually acquiesced and agreed to retain a financial advisor for Strack, but only after stipulating

that any engagement must have an atypically narrow scope.  They wanted to ensure that Strack's

advisor would not interfere with a transaction that benefitted CGI's Class A shareholders.

66.    The Minority Appointees further asserted—correctly—in an April 6, 2016, Strack

Board meeting that the Strack Board members' fiduciary duties ran to Strack, not to a particular

constituency (*i.e.*, not to CGI's Members):

Director [Jeff] Strack said that the Board has a responsibility to the
shareholders of [Strack] to determine if the value is at the maximum value.
The 3 Central Board Directors said that any deal has to make sense for all
shareholders involved.  Director Strack disagreed with their position and
stated that it is the job of the [Strack] Board is [*sic.*] solely to [Strack]
shareholders.

67.    The CGI Appointees abuse of Strack came to a head at an April 25, 2016 Strack

Board meeting.  There, the Strack Board discussed CGI's April 21st determination to cease

pursuing a transaction with AWG and to cease marketing SVT:

Director [Jeff] Strack expressed his opinion to continue to find a financial
advisor for [Strack] and to continue to market [SVT] so that the Directors,

17

as well as the shareholders, have an idea of the true value of the Company. Director Raab reiterated that marketing the Company without a supply agreement would have great value for the shareholders. Both Directors Strack and Raab expressed their opinion that the existing three delegate Directors named by [CGI], the 80% shareholder of [Strack], have a conflict of interest sitting on this Board.

68.    At the April 25, 2016 Strack Board meeting, Andrew Raab moved to pursue a sale of SVT unburdened by a long-term purchasing agreement. A recent analysis by The Food Partners had shown that SVT would garner 5 to 7 times more value in an independent transaction, untethered to a long-term contract. However, the CGI Appointees blocked this obvious course of action. Nemeth opposed selling SVT "unless [there was] a buyer for Central Grocers" because CGI needed to retain SVT's volume to maintain patronage rebates for customers. Selling SVT might be good for SVT's owners and creditors, but it would be bad for the CGI Members. The CGI Appointees were afraid that a sale of SVT to another retailer would result in a "problem" for CGI in "supporting all [its] members."

69.    As the Strack Board considered Raab's motion to market SVT, the Minority Appointees even reminded the CGI Appointees that their fiduciary duties ran to Strack, not CGI. Yet Nemeth refused to vote for an independent sale because "it was not in the best interests of [CGI]," even though it "[m]ay have been in the best interest of SVT to market itself." Kotara voted against an independent sale because he "felt that [he] had a responsibility to everyone, not just Strack & Van Til." Ultimately, the CGI Appointees refused to try to sell SVT for one reason: they put their loyalty to CGI Members above their legal duties to Strack. Kotara had a particular interest in preventing a sale of SVT because he owned/managed a CGI Member.

70.    No sale of SVT untethered to a distribution agreement was attempted in April 2016. One was never accomplished outside of bankruptcy. SVT eventually sold in bankruptcy for just $73.1 million in July 2017. As Nemeth admitted in his sworn testimony, had Strack pursued a sale

of SVT untethered to a distribution agreement in April 2016, it could have achieved one, and for a much greater amount than was achieved during SVT's bankruptcy.

71.     That SVT would have sold for more in April 2016 than it sold for a year later is demonstrated by the fact that the ultimate buyer of the then-remaining SVT stores (Indiana Grocery Group, or "IGG") and Albertson's made offers to buy SVT based on the stores' last-twelve-months EBTIDA available in April 2017 times an EBITDA multiple.  The stores' last-twelve-months EBTIDA available in April 2017 was $28.35 million.  But twelve months earlier, it was $49.65 million.  Had the CGI Appointees not breached their fiduciary duties to Strack and allowed Strack to pursue a sale of SVT untethered to a long-term purchasing contract in April 2016, Strack would have realized tens of millions more dollars in the sale.

**E.     CGI Insiders Caused CGI to Improperly Redeem Insiders' Class B Shares.**

72.     As discussed above, CGI's Class B stock supposedly reflected the value of CGI's non-patronage assets.  A valuation of those assets was done by a third party at the end of each fiscal year (the end of each July), and that valuation determined the value of the Class B stock for the year, at least for CGI's internal purposes.  CGI's By-laws allowed shareholders to redeem their shares, at the current share valuation, under certain circumstances.  A holder knowing that CGI's and Strack's business was declining, such that the value of the stock after the upcoming valuation would be lower than the value was currently, had an incentive to cash out the stock before the end of the fiscal year.

73.     To prevent such insider gaming of the system, CGI's By-laws contained specific rules governing how and when Class B shareholders could cash out their shares.  After the valuation of CGI at the end of each fiscal year, the CGI Board notified shareholders of the share valuation, and shareholders had 60 days after the notice to notify CGI that they wished to redeem their shares.  Redemptions would be made in cash and based on the new valuation.

74.     But outside the 60-day window, CGI would redeem shares only by issuing a promissory note that provided five equal payments over five years.  CGI could suspend payments on a promissory note "if the Board of Directors determines that such suspension is in the best interests of" CGI.  Moreover, employees could redeem outside the 60-day window only if their employment was terminated.

75.     Kubis and Coari ignored these By-laws for their own benefit, gaming the system in the very way that the By-laws were designed to prevent.  By July 2016, Kubis and Coari knew the CGI ship was sinking.  They knew CGI's 2015-2016 attempt to transition Members to AWG and sell CGI's assets ended in failure.  Moreover, at the May 11, 2016 CGI Board meeting, which Coari attended, Kubis announced that CGI's sales were down 7% year-to-date and down 8.2% for the quarter.  He told the Board that SVT's sales were down 14% year-to-date and down 15.2% for the quarter.  He also told the Board that the value of the Class B shares would fall to **below $100** per share for fiscal 2016, after having been valued at **$148** the prior year.  CGI's financial performance continued to decline in the following months, as Kubis explained at the July 14, 2016 Board meeting (which Coari also attended).

76.     To capture the fiscal 2015 share valuation ($148 per share), Kubis and Coari had to terminate their employments before July 31, 2016—the end of fiscal 2016.  Kubis "resigned" on July 11, 2016, and Coari quit on July 15, 2016.  They both requested that CGI pay them in a cash lump sum, rather than pursuant to the five-year promissory note required by the By-laws.  By doing so, Kubis and Coari put their own interests ahead of CGI, CGI's other shareholders, and CGI's creditors.  They used inside information to extract as much cash as possible from the faltering CGI.

77.   Without Board approval or authority, Kubis and Nemeth approved Coari's redemption, and Nemeth and Kotara approved Kubis' redemption.  Nemeth and Kotara approved Kubis' redemption even though CGI's outside general counsel, Kerry Lavelle, specifically explained to Nemeth and Kotara in a July 12, 2016, email that the By-laws forbid the cash payment. Nemeth claimed in his deposition to have overlooked Lavelle's email and that he would not have approved Kubis' redemption had he seen it.   Nemeth and Kotara were grossly negligent in approving Kubis' redemption payment.

78.   Kubis' redemption was particularly improper because he did not truly terminate his employment.  He "terminated" his employment but then continued doing largely the same work for virtually the same pay pursuant to an independent contractor agreement.  His "termination" was just a ruse to justify redeeming his shares at the inflated 2015 valuation amount.

79.   In addition, Kubis allowed Frank and Joe Kumkoski, who had owned a former CGI Member, to obtain a lump-sum redemption of their Class B shares on July 20, 2016.  Like employees, former Members could obtain lump sum redemptions during the 60-day window after the valuation for the preceding year was announced, but that window had long closed by the time the Kumkoskis requested redemptions on July 19, 2016.  Outside the 60-day window, former Members were, like employees, limited to payment via a five-year promissory note.  Kubis was aware of this restriction, but in reckless disregard of his duties, he authorized the payment to the Kumkoskis, anyway.

80.   The misconduct of Nemeth, Kubis, Kotara, and Coari caused CGI to make the following payments:

- $1,596,930 to an escrow account for the benefit of Kubis on July 25, 2016;
- $1,868,204 to Coari on July 26, 2016; and
- $867,252 to the Kumkoskis on July 20, 2016.

21

81.     Absent their misconduct, CGI would not have made any of these payments.  At most, CGI would have issued promissory notes to Coari and the Kumkoskis and, perhaps, made one payment on the notes before the Petition Date.  They would now hold claims against the CGI estate, like CGI's other unsecured creditors.  Absent their misconduct, CGI would not have even issued a note to Kubis because he did not truly terminate his employment in July 2016.

**F.     The CGI Directors Further Enriched Their Stores Through an Improper Rebate.**

82.     Two months after Nemeth, Coari, Kotara, and Kubis allowed these improper share redemptions, the CGI Board voted to further deplete CGI's waning resources for the CGI Directors' own benefit.

83.     In September 2016, the CGI Board met to determine the amount of CGI's annual patronage rebate.  At the meeting, Kubis reported on CGI's financial condition and relayed a wave of bad news.  The bad news Kubis delivered at this meeting was consistent with the financial reports Kubis had provided at Board meetings previously in 2016.

84.     According to Kubis, CGI's sales decreased nearly $99 million, or 6.7%, from the previous year.  SVT's CEO Jeff Strack added that SVT's sales were down 12.4% for the fourth quarter and 13.6% year-to-date.  Reflecting even deeper financial issues, Kubis stated that he expected CGI to breach various loan covenants in the ensuing quarter, requiring CGI to negotiate loan amendments to achieve suitable audit results for the prior year.  He anticipated the loan amendments would increase CGI's interest costs substantially.

85.     In addition, CGI made several personnel adjustments as a result of its poor performance in 2016.  Executive management received no bonuses, CGI paid out just $750,000 in bonuses to rank-and-file employees, and Nemeth laid off staff at CGI's headquarters.  The SVT Board replaced Diehl in May 2016 and hired Jeff Strack as its third CEO in less than two years.

22

86.     CGI's financial statements reflected the downward spiral.  CGI realized a net loss of $39.6 million for the fiscal year ending July 31, 2016.  The loss derived from a $28 million impairment charge against goodwill and a $39 million impairment charge against fixed assets.

87.     Finally, of course, every CGI Director knew CGI's attempt to sell its wholesale and retail assets had met with failure a few months earlier.

88.     Despite all this bad news, and despite knowing CGI's financial condition was declining with no apparent solution in sight, the CGI Directors approved the maximum allowable patronage rebate of $44.5 million.  The By-laws did not require a rebate of this or any magnitude. To the contrary, the By-laws required CGI to first allocate reserves for "contingencies or expected losses of the Corporation . . .  in the best interests of the Corporation" before even calculating the amount of the annual patronage rebate.  Before declaring the 2016 rebate, the CGI Director Defendants failed to consider whether it would be prudent instead to retain a portion of the rebate payments to improve CGI's or SVT's condition or retain the money against future contingencies.

89.     Of course, the fact looming over the CGI Directors' decision to declare a rebate was that their stores were the primary recipients of the rebate.  Although the rebate benefited all Members, the CGI Directors' stores represented 60-70% of CGI's non-SVT business.

90.     After the CGI Directors approved the rebate, but before CGI paid it, Kubis met with CGI's lenders to discuss compliance issues.  After a review of the company's financials, the lenders required CGI to defer payment of at least 30% of the 2016 rebate to prevent CGI from violating various loan covenants, including its "fixed charge ratio," which was designed to ensure CGI had enough cashflow to service its debt.

23

91.     Kubis explained the loan compliance problems to the CGI Directors in an October

1, 2016, email.  Nemeth provided further explanation regarding the situation at an October 13,

2016, Board meeting:

> Nemeth explained to the Board that they had recently had a bank group
> meeting where six banks were represented with a total of approximately
> twenty-four bankers in the conference room at [CGI].  They examined the
> SVT sales and expressed great concern as to the direction of [CGI] with the
> declining sales, and a declining EBITDA.  He represented to the Directors
> that the subsidiary SVT, LLC had to prepare an amended first quarter
> budget for fiscal 2017 and readjusted its EBITDA expectations from a
> positive $2.4M EBITDA to a negative $5M.  He indicated that the bankers
> are greatly concerned with this and after some analysis indicated that our
> loan covenants will be in default . . . .

92.     The CGI Board reluctantly agreed at the meeting to the minimum holdback

demanded by the lenders, and the CGI Board voted to hold back 30% of the $44.5 million rebate

until CGI could "meet[ its] loan covenants and budgetary goals submitted to the bank for fiscal

year 2017 . . . ."

93.     However, the CGI Directors failed to reconsider any other portion of the rebate.

Despite knowing that CGI and SVT were spiraling down, and despite having no real plan to stop

the declines, they only agreed to stop the minimum 30% required by the lenders.  Determining to

cancel a greater portion of the rebate would, after all, mean less money for the CGI Directors'

stores.  On October 27, 2016, CGI paid out $21.34 million of the 2016 rebate (the $44.5 million

approved, less what had been previously paid in quarterly installments, less the 30% held back) to

the Members, including the Directors' stores.

94.     CGI never improved its fixed charge ratio such that it could pay the held-back

portion of the 2016 rebate.

**G.**      **The CGI Directors, Kubis, and Nemeth Failed to Require Members to Maintain Their Buying Deposit Accounts.**

95.      The CGI Directors further put their own interests ahead of CGI's by failing to require the Members to properly maintain their buying deposits.  This failure cost CGI millions of dollars when Members failed to pay for the groceries they purchased.

96.      CGI had in place a system designed to make sure Members always paid CGI for the product they purchased.  Members were required to maintain sufficient "Buying Deposits" with CGI such that, if a Member failed to pay for groceries, CGI could look to the Member's Buying Deposits for payment.  Although CGI called these payments "deposits," the deposits were not kept separately from CGI's other funds.  Rather, the Member deposits were kept in CGI's general funds and used to the same extent and in the same manner as funds derived from CGI's operations.

97.      CGI's By-laws required Members to maintain deposits:

> Each Member, Patron, or Customer, upon becoming a Member, Patron or Customer, respectively, shall be required to deposit with the Corporation an amount fixed by the Rules and Regulations.  In addition, each Member, Patron or Customer shall maintain with the Corporation Buying Deposits in an amount at least equal to the greater of (a) an amount fixed by the Rules and Regulations or (b) two (2) times such Person's average weekly purchases. … The Corporation is hereby granted a perfected, first-priority security interest in the Cash Deposits of each Member, Patron or Customer, as security for the payment, from time to time and as often as may become due and payable, of any and all indebtedness of any nature payable to the Corporation by the Member, Patron or Customer.[3]

98.      Consistent with the By-laws, the CGI Membership Applications required Members to maintain cash deposits with CGI equal to two times the Member's average weekly purchases.

---

[3] By-laws Art. XII, § 8.

99.     CGI's Rules and Regulations provided that existing Members had to meet their

Buying Deposit requirements in one of the two following ways:

> Full deposit requirement [*sic*] must be satisfied within two years.  This rule
> contemplates that either 80% of Members [*sic*] vested "B" stock value (net
> of any outstanding Member loans) is sufficient, or consideration that the
> Members [*sic*] existing stores are fully deposited and acceptable ACH
> history.

100.     Unfortunately, the cash deposits CGI had on hand were woefully deficient to cover

the outstanding accounts receivable owed for product purchases by Members (the "A/R").  On the

Petition Date, 333 Member stores owed CGI more for purchased product than they had in cash

deposits with CGI.  Those 333 Member stores owed CGI approximately $32.8 million for product,

but CGI had cash deposits for those stores of only $4.7 million, leaving a net difference of $28.1

million.

101.     As noted above, CGI allowed Members to meet their Buying Deposit requirements

through their Class B share holdings.  Thus, some of the deficit between the unpaid A/R and the

actual cash deposits could have theoretically been made up by the value of the Class B shares those

Members owned.  CGI calculated the value of Members' Class B shares for Buying Deposit

purposes based on the stated value of the shares at the time of issuance.  However, the Class B

shares were grossly overvalued long before CGI entered bankruptcy, as the CGI Directors, Kubis,

and Nemeth knew, so that even if Members' Buying Deposit requirements were technically met,

CGI had grossly insufficient funds to cover the unpaid A/R.  Knowing the Class B shares were

overvalued, the CGI Directors, Nemeth, and Kubis should have made particularly aggressive

efforts to make sure the Buying Deposit requirements were met.

102.     Yet even accounting Members' Class B shares by their issuance value, still many

Members—including many of the Members controlled by CGI Directors—failed to meet their

Buying Deposit requirements.  Taking into account the Class B shares (at issuance value), 184 stores owed more than they had in Buying Deposits when CGI filed for bankruptcy.  Those 184 stores owed $7.96 million more for unpaid product than the total sum of their cash deposits plus their Class B shares, valued based on the issuance value.

103.    After the Petition Date, CGI made attempts to collect unpaid A/R from members, and the Trustee is currently attempting to collect for the unpaid A/R.  However, as of the filing of this Complaint, over $30 million, net of cash deposits, is still unpaid.

104.    At no point did the CGI Directors cause CGI to undertake efforts to cause the Members to bring their Buying Deposits into full compliance with CGI's By-laws, Rules and Regulations, and Membership Applications.  The need to make sure Members complied with their Buying Deposit requirements was always important, but particularly so once the true value of the Class B shares plummeted.  The CGI Directors' failure to take this obvious and needed action to protect CGI is readily explained by the fact that at least eight of the CGI Directors (Cortesi, Dal Pra, Dremonas, Ingraffia, Kotara, Lagestee, Linares, and Sullivan) controlled Members that failed to meet their Buying Deposit requirements (even counting their Members' associated Class B shares).

105.    At least those eight Directors knew Members were not meeting their Buying Deposit requirements because their stores were not meeting their Buying Deposit requirements.  Once again, rather than act in the best interests of CGI, the CGI Directors acted in their own best interests by failing to enforce CGI's Buying Deposit requirements and direct CGI's management to pursue all Members (including those Members controlled by the CGI Directors) to fulfill their Buying Deposit requirements.

106.    CEO Nemeth and CFO Kubis likewise breached their duties to CGI by failing to pursue Members to fulfill their Buying Deposit requirements.  Rather than rock the boat and anger the Directors, Nemeth and Kubis failed to take any action to require Members to fulfill their Buying Deposit requirements.  Instead, they allowed CGI to remain under-protected.

**H.    CGI Became Insolvent by August 2016 at the Latest.**

107.    CGI was insolvent by August 2016.  Although it did not file for bankruptcy until May 2017, CGI was doomed to fail long before then.  Its financial performance suffered dramatically throughout 2016 and 2017, largely driven by SVT's challenges.  As SVT struggled, it purchased less, and, because it was CGI's primary customer, CGI's cash flow declined.  In addition, reduced purchases from SVT caused CGI's overall purchase volume to shrink enough to reduce its margins and affect the Members' patronage rebate.  This effect, in turn, made CGI less attractive to customers and potential customers.

108.    Even after CGI recognized a $67 million in impairments at the end of fiscal 2016, its balance sheet still overstated the company's financial condition.  CGI had significant contingent liabilities that reduced the true value of the company.  These liabilities included approximately $95 million in unfunded pension withdrawal liability.  CGI also overvalued certain assets.  The 2016 year-end balance sheet valued its distribution center at $70 million.  It sold for just $61 million in July 2017.  In addition, CGI valued its interest in SVT at $94 million, but SVT's EBITDA was plummeting.  SVT was also saddled with pension fund liabilities.  Given the CGI Appointees' refusal to sell SVT untethered to a long-term purchasing contract, by August 2016 CGI should have valued its interest in SVT at something close to zero, not $94 million.  Moreover, CGI and SVT were highly leveraged yet had thin operating margins, making them especially vulnerable to downturns in their businesses.

28

109.    After the CGI Board approved the September 2016 patronage rebate, CGI's lenders expressed "great concern as to the direction of the Company."  If CGI paid the dividend, it would violate its liquidity covenants, so the banks required CGI to hold back 30% of the rebate.  CGI never recovered enough to pay the deferred amount.

110.    Finally, the CGI bankruptcy has resulted in massive losses for CGI's secured and unsecured creditors.  The CGI estate faces unpaid creditor claims of approximately $361,800,000, and it will only ever be able to pay back a small fraction of this amount.  CGI filed for bankruptcy in May 2017.  There were no major unforeseen events impacting the value of CGI between July 31, 2016 (the close of CGI's fiscal year) and the time it filed bankruptcy.

## CAUSES OF ACTION

### Count 1 – Breach of Fiduciary Duty of Care Related to Failure to Sell SVT
### (against the CGI Appointees)

111.    The Trustee re-alleges the allegations set forth in the above paragraphs.

112.    As members of the Strack Board, each of the CGI Appointees owed the fiduciary duty of care to Strack under Indiana law,[4] obligating them to act in an informed, deliberate, and rational manner, with candor and full disclosure of material information, and with the degree of care that an ordinary prudent person would exercise under the same or similar circumstances.

113.    The CGI Appointees breached their fiduciary duty of care to Strack by engaging in grossly negligent conduct, with recklessness, and in conscious disregard or indifference.  Their breaches included the following:

      a.      failing to adequately consider an independent sale of SVT;

      b.      ignoring material information available to Strack when considering the propriety of an independent sale of SVT;

---

[4] Strack was incorporated under Indiana law.  Accordingly, under the internal affairs doctrine, Counts 1 and 2 in this complaint are governed by Indiana law.

    c.     failing to acknowledge and/or consider material information provided by Strack's advisors regarding the propriety of an independent sale of SVT; and

    d.     recommending that Strack forego a sale of SVT despite knowing that SVT was in poor financial condition with little chance of recovery.

114.    The CGI Appointees failed to make any kind of informed business judgment regarding the potential sale of SVT in April 2016. Indeed, as Kotara and Nemeth admitted to the Trustee in their sworn testimony, the CGI Appointees considered only the impact a potential sale would have on CGI.

115.    As a direct and proximate result of their breaches of fiduciary duty, the CGI Appointees caused Strack to suffer substantial damages, including the difference between the value of SVT as of April 2016 minus the amount it sold for during the bankruptcy case.

116.    Accordingly, the Trustee seeks to recover these damages from the CGI Appointees.

**Count 2 – Breach of Fiduciary Duty of Loyalty Related to Failure to Sell SVT
(against the CGI Appointees)**

117.    The Trustee re-alleges the allegations set forth in the above paragraphs.

118.    As members of the Strack board of directors, each of the CGI Appointees owed the fiduciary duty of loyalty to Strack under Indiana law, obligating them to act in good faith, with candor and full disclosure of material information, and in the best interests of Strack.

119.    The CGI Appointees breached their fiduciary duty of loyalty to Strack by acting in their own self-interest and with a purpose other than that of advancing Strack's best interests, by failing to act in good faith, with candor and full disclosure of material information, and by failing to act in the face of a known duty to act, demonstrating a conscious disregard for their duties with respect to the potential sale of SVT. Their breaches included the following:

    a.     failing to adequately consider an independent sale of SVT;

b.      ignoring material information available to Strack when considering the propriety of an independent sale of SVT;

c.      failing to acknowledge and/or consider material information provided by Strack's advisors regarding the propriety of an independent sale of SVT;

d.      recommending that Strack forego a sale of SVT despite knowing that SVT was in poor financial condition with little chance of recovery while captive to CGI; and

e.      refusing to consider a sale of SVT to protect their own economic interests and the economic interests of CGI.

120.    As a direct and proximate result of their breaches of fiduciary duty, the CGI Appointees caused the company to suffer substantial damages, which include the difference between the value of SVT as of April 2016 minus the amount it sold for during the bankruptcy case.

121.    Accordingly, the Trustee seeks to recover these damages from the CGI Appointees.

### Count 3 – Breach of Fiduciary Duty Related to Kubis Stock Redemption (against Nemeth, Kotara, and Kubis)

122.    The Trustee re-alleges the allegations set forth in the above paragraphs.

123.    Nemeth and Kubis, as officers, and Kotara, as a director, owed CGI the fiduciary duties of care, good faith, and loyalty under Illinois law,[5] obligating them to act with due care, in good faith, with candor and full disclosure of material information, and in the best interests of CGI.

124.    Kubis breached his fiduciary duties of good faith and loyalty to CGI by acting in his own self-interest and with a purpose other than advancing CGI's best interests with respect to Kubis's July 2016 share redemption.  His breaches included the following:

a.      failing to acknowledge material information provided by CGI's advisors concerning the permissibility of his July 2016 share redemption under CGI's by-laws;

---

[5] CGI was incorporated under Illinois law.  Accordingly, under the internal affairs doctrine, Counts 3, 5, 7, 9, and 10 in this complaint are governed by Illinois law.

b.      prioritizing his own financial interests over CGI's to CGI's detriment;

c.      requesting a full, cash-out share redemption despite knowing the CGI By-laws required the redemption to be paid through a five-year promissory note; and

d.      requesting and engineering a share redemption based on a false "resignation" deliberately designed to allow Kubis to obtain a share redemption before the value of the Class B stock fell in August 2016, as Kubis knew it would based on inside information not available to all CGI members and Class B shareholders.

125.    Nemeth and Kotara breached their fiduciary duties of care, good faith and loyalty to CGI by acting with gross negligence, by failing to act in good faith, with candor and full disclosure of material information, and by failing to act in the face of a known duty to act, demonstrating a conscious disregard for their duties with respect to the negotiation and execution of Kubis's July 2016 share redemption. Their breaches included the following:

e.      ignoring or failing to acknowledge material information provided by CGI's advisors concerning the permissibility of Kubis's July 2016 share redemption under CGI's by-laws;

f.      prioritizing Kubis's financial interests over CGI's to CGI's detriment;

g.      approving a full, cash-out share redemption for Kubis despite knowing the CGI By-laws required the redemption to be paid through a five-year promissory note; and

h.      approving Kubis's July 2016 share based on a false "resignation" deliberately designed to allow Kubis to obtain a share redemption before the value of the Class B stock fell in August 2016, as Kubis, Nemeth, and Kotara knew it would based on inside information not available to all CGI members and Class B shareholders.

126.    As a direct and proximate result of their breaches of fiduciary duty, Nemeth, Kubis, and Kotara caused CGI to suffer substantial damages, including approximately $1.6 million, which is the amount CGI paid to redeem Kubis's Class B shares. In addition, the Trustee seeks disgorgement from Kubis for the full amount of his Class B share redemption.

**Count 4 – Avoidance of Fraudulent Transfers Related to
Kubis Stock Redemptions Pursuant to 11 U.S.C. § 548(a)(1)(B)
(against Kubis and Lavelle Law)**

127.     The Trustee re-alleges the allegations set forth in the above paragraphs.

128.     CGI entered a Stock Redemption Agreement with Kubis dated July 25, 2016.  In the Stock Redemption Agreement (the "Kubis Redemption Agreement"), CGI agreed to purchase Kubis's Class B stock for $1,596,920 (the "Kubis Redemption Amount").  CGI also entered an Escrow Agreement with Kubis dated July 25, 2016.  In the Escrow Agreement, CGI agreed to pay the Kubis Redemption Amount into an escrow account for which Lavelle Law was the escrowee. The Escrow Agreement provided that Lavelle Law would pay the Kubis Redemption Amount (plus interest, minus fees) upon the termination of an Independent Contractor Agreement between CGI and Kubis.

129.     CGI received no value, and certainly not reasonably equivalent value, for entering the Kubis Redemption Agreement or otherwise agreeing to pay cash to purchase Kubis's Class B stock.  CGI had no pre-existing obligation to purchase Kubis's Class B stock.  To the contrary, under CGI's by-laws, it was allowed to only pay Kubis via a five-year promissory note, which note would include the right to defer payment in the case of CGI's financial hardship.

130.     On or about July 25, 2016, CGI paid the Kubis Redemption Amount into the escrow account pursuant to the Escrow Agreement.

131.     Although the Escrow Agreement did not provide for the release of the Kubis Redemption Payment prior to the termination of the Independent Contractor Agreement, CGI agreed with Kubis to issue an Escrow Release Notice prior to the termination of the Independent Contractor Agreement, allowing Kubis to receive almost all of the Kubis Redemption Amount prior to the termination of the Independent Contractor Agreement.  Specifically, Lavelle Law, as escrowee, paid Kubis $1,471,920 on or about March 1, 2017, and $25,000 on or about March 31,

33

2017. On information and belief, Lavelle Law still retains $100,000 of the Kubis Redemption Payment (plus interest).

132.    CGI did not receive reasonably equivalent value for issuing the Escrow Release Notice, which allowed Kubis to receive early payments from the escrow account on or about March 1 and March 31, 2017.

133.    On each of the dates CGI entered the Kubis Redemption Agreement and the Escrow Agreement, paid the Kubis Redemption Amount to Lavelle Law, and issued the Escrow Release Notice, and on the dates Lavelle Law made payments as escrowee to Kubis, CGI—

- was insolvent;

- was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital; and

- intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured.

134.    CGI's entering the Kubis Redemption Agreement and the Escrow Agreement, and paying the Kubis Redemption Amount to Lavelle Law, and issuing the Escrow Release Notice all constituted the transfer of CGI's property, and these transfers were all made within two years of the Petition Date.

135.    For these reasons, the Trustee seeks to avoid multiple agreements and transfers pursuant to 11 U.S.C. § 548(a)(1)(B):

- the Kubis Redemption Agreement;

- the Escrow Agreement pursuant;

- the Escrow Release Notice;

- the payment of the Kubis Redemption Amount to Lavelle Law; and

- the payments to Kubis from Lavelle Law.

34

**Count 5 – Avoidance of Fraudulent Obligations Related to Kubis Stock Redemptions**
**Pursuant to 11 U.S.C. § 544(b)(1), 740 ILCS 160/5(a)(2) and 740 ILCS 160/6(a)**
**(against Kubis and Lavelle Law)**

136.    The Trustee re-alleges the allegations set forth above.

137.    At the time CGI entered the Kubis Redemption Agreement and the Escrow Agreement, paid the Kubis Redemption Amount to Lavelle Law, and issued the Escrow Release Notice, CGI had multiple creditors holding unsecured, allowable claims who could have voided the transactions discussed in this Count.

138.    CGI did not receive reasonably equivalent value for entering the Kubis Redemption Agreement and the Escrow Agreement, for issuing the Escrow Release Notice, for paying the Kubis Redemption Amount to Lavelle Law, or for Lavelle Law's making the March 1 and March 31 payments to Kubis from the escrow account.

139.    On each of the dates CGI entered the Kubis Redemption Agreement and the Escrow Agreement, paid the Kubis Redemption Amount to Lavelle Law, and issued the Escrow Release Notice, and on the dates Lavelle Law made payments as escrowee to Kubis, CGI—

- was insolvent;

- was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital; and

- intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured.

140.    CGI's entering the Kubis Redemption Agreement and the Escrow Agreement, and paying the Kubis Redemption Amount to Lavelle Law, and issuing the Escrow Release Notice constituted the transfer of CGI's property.

141.    For these reasons, the Trustee seeks to avoid multiple agreements and transfers pursuant to 11 U.S.C. § 544(b)(1), 740 ILCS 160/5(a)(2) and 740 ILCS 160/6(a):

- the Kubis Redemption Agreement;

- the Escrow Agreement pursuant;

- the Escrow Release Notice;

- the payment of the Kubis Redemption Amount to Lavelle Law; and

- the payments to Kubis from Lavelle Law.

**Count 6 – Avoidance of Fraudulent Transfers Related to
Kubis Stock Redemptions Pursuant to 11 U.S.C. § 548(a)(1)(A)
(against Kubis and Lavelle Law)**

142.    The Trustee re-alleges the allegations set forth in the above paragraphs.

143.    CGI, through its agents Kubis, Kotara, and Nemeth (among others), knew there was a substantial likelihood, if not a certainty, that CGI would be unable to pay its creditors in full by July 25, 2016. However, for the purpose of protecting insider Kubis, CGI entered agreements and made transfers so that Kubis could receive full value for his Class B shares, thereby depriving CGI's creditors of the value of the property Kubis received. CGI entered these agreements and made these transfers although it had no obligation to do so. CGI's entering these agreements and making these transfers reduced CGI's property to the detriment of its other unsecured creditors.

144.    The agreements and transfers CGI made or approved to protect Kubis to the detriment of CGI's other creditors were, as described above:

- the Kubis Redemption Agreement;

- the Escrow Agreement pursuant;

- the Escrow Release Notice;

- the payment of the Kubis Redemption Amount to Lavelle Law; and

- the payments to Kubis from Lavelle Law.

145.    CGI did not receive reasonably equivalent value for entering the Kubis Redemption Agreement and the Escrow Agreement, for issuing the Escrow Release Notice, for paying the Kubis Redemption Amount to Lavelle Law, or for Lavelle Law's making the March 1 and March 31 payments to Kubis from the escrow account.

146.    CGI's entering the Kubis Redemption Agreement and the Escrow Agreement, and paying the Kubis Redemption Amount to Lavelle Law, and issuing the Escrow Release Notice all constituted the transfer of CGI's property, and these transfers were all made within two years of the Petition Date.

147.    For these reasons, the Trustee seeks to avoid multiple agreements and transfers pursuant to 11 U.S.C. § 548(a)(1)(a):

- the Kubis Redemption Agreement;

- the Escrow Agreement pursuant;

- the Escrow Release Notice;

- the payment of the Kubis Redemption Amount to Lavelle Law; and

- the payments to Kubis from Lavelle Law.

**Count 7 – Avoidance of Fraudulent Transfers Related to Kubis Stock Redemptions
Pursuant to 11 U.S.C. § 544(b) and 740 ILCS 160/5(a)(1)
(against Kubis and Lavelle Law)**

148.    The Trustee re-alleges the allegations set forth above.

149.    At the time CGI entered the Kubis Redemption Agreement and the Escrow Agreement, paid the Kubis Redemption Amount to Lavelle Law, and issued the Escrow Release Notice, CGI had multiple creditors holding unsecured, allowable claims who could have voided the transactions discussed in this Count.

150.     For this reason, and for the reasons set forth in Count 6, the Trustee seeks to avoid

multiple agreements and transfers pursuant to 11 U.S.C. § 544(b) and 740 ILCS 160/5(a)(1):

- the Kubis Redemption Agreement;

- the Escrow Agreement pursuant;

- the Escrow Release Notice;

- the payment of the Kubis Redemption Amount to Lavelle Law; and

- the payments to Kubis from Lavelle Law.

### Count 8 – Breach of Fiduciary Duty Related to Coari Stock Redemption
### (against Nemeth, Kotara, Kubis, and Coari)

151.     The Trustee re-alleges the allegations set forth in the above paragraphs.

152.     Coari, Nemeth, and Kubis, as officers, and Kotara, as a director, owed CGI the

fiduciary duties of good faith, loyalty, and care under Illinois law, obligating them to act in good

faith, with candor and full disclosure of material information, with due care, and in the best

interests of CGI.

153.     Coari, Nemeth, Kubis, and Kotara breached their fiduciary duties of good faith and

loyalty to CGI by acting in their own self-interest and with a purpose other than that of advancing

CGI's best interests, by failing to act in good faith, with candor and full disclosure of material

information, and by failing to act in the face of a known duty to act, demonstrating a conscious

disregard for their duties with respect to the negotiation and execution of Coari's July 2016 share

redemption.  Their breaches included prioritizing Coari's financial interests over CGI's to CGI's

detriment and approving a full, cash-out redemption for Coari despite knowing the CGI By-laws

required the redemption to be paid by way of a five-year promissory note.

154.     As a direct and proximate result of their breaches of fiduciary duty, Nemeth,

Kotara, Kubis, and Coari caused CGI to suffer substantial damages, including approximately $1.9

million, which is the amount CGI paid to redeem Coari's Class B shares.  In addition, the Trustee

seeks disgorgement from Coari for the full amount of his Class B share redemption.

### Count 9 – Avoidance of Fraudulent Transfers Related to Coari Stock Redemption Pursuant to 11 U.S.C.  § 548(a)(1)(B) (against Coari)

155.    The Trustee re-alleges the allegations set forth in the above paragraphs.

156.    On or about July 26, 2016, CGI and Coari entered into a Stock Redemption

Agreement (the "Coari Redemption Agreement") that required CGI to purchase Coari's Class B

stock for $1,868,204 (the "Coari Redemption Amount").

157.    On or about July 26, 2016, CGI paid the Coari Redemption Amount to Coari.

158.    CGI received no value, and certainly not reasonably equivalent value, for entering

the Coari Redemption Agreement or for paying the Coari Redemption Amount.  CGI had no pre-

existing obligation to purchase Coari's Class B stock.  To the contrary, under CGI's By-laws, it

was allowed to only pay Coari via a five-year promissory note, which note would include the right

to defer payment in the case of CGI's financial hardship.

159.    On July 26, 2016, and at the time CGI entered the Coari Redemption Agreement

and paid the Coari Redemption Amount, CGI—

- was insolvent;

- was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital; and

- intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured.

160.    CGI's entry into the Coari Redemption Agreement its payment of the Coari

Redemption Amount constituted transfers of CGI's property made within two years of CGI's May

2, 2017, petition date.

161.    For these reasons, the Trustee seeks to avoid the Coari Redemption Agreement and the payment of the Coari Redemption Amount, pursuant to 11 U.S.C. § 548(a)(1)(B).

**Count 10 – Avoidance of Fraudulent Obligations Related to Coari Stock Redemption Pursuant to 11 U.S.C. § 544(b)(1), 740 ILCS 160/5(a)(2) and 740 ILCS 160/6(a) (against Coari)**

162.    The Trustee re-alleges the allegations set forth above.

163.    At the time CGI entered the Coari Redemption Agreement and paid the Coari Redemption Amount, CGI had multiple creditors holding unsecured, allowable claims who could have voided those transactions.

164.    CGI did not receive reasonably equivalent value for entering the Coari Redemption Agreement or for paying the Coari Redemption Amount.

165.    On the date CGI entered the Coari Redemption Agreement and paid the Coari Redemption Amount, CGI—

- was insolvent;

- was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital; and

- intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured.

166.    CGI's entering the Coari Redemption Agreement and paying the Coari Redemption Amount constituted transfers of CGI's property.

167.    For these reasons, the Trustee seeks to avoid the Coari Redemption Agreement and the transfer of the Coari Redemption Amount pursuant to 11 U.S.C. § 544(b)(1), 740 ILCS 160/5(a)(2) and 740 ILCS 160/6(a).

### Count 11 – Avoidance of Fraudulent Transfers Related to
### Coari Stock Redemption Pursuant to 11 U.S.C. § 548(a)(1)(A)
### (against Coari)

168.    The Trustee re-alleges the allegations set forth in the above paragraphs.

169.    CGI, through its agents Kubis, Kotara, Nemeth, and Coari (among others), knew
there was a substantial likelihood, if not a certainty, that CGI would be unable to pay its creditors
in full by July 25, 2016.  However, for the purpose of protecting insider Coari, CGI entered the
Coari Redemption Agreement and paid the Coari Redemption Amount so that Coari could receive
full value for his Class B shares, thereby depriving CGI's creditors of the value of the property
Coari received.  CGI entered the Coari Redemption Agreement and paid the Coari Redemption
Amount although it had no obligation to do so.  CGI's entering that agreement and making that
transfer reduced CGI's property to the detriment of its unsecured creditors.

170.    CGI did not receive reasonably equivalent value for entering the Coari Redemption
Agreement or paying the Coari Redemption Amount.

171.    CGI's entering the Coari Redemption Agreement and paying the Coari Redemption
Amount constituted transfers of CGI's property, and these transfers were all made within two years
of CGI's May 2, 2017, petition date.

172.    For these reasons, the Trustee seeks to avoid the Coari Redemption Agreement and
payment of the Coari Redemption Amount.

### Count 12 – Avoidance of Fraudulent Transfers Related to Coari Stock Redemption
### Pursuant to 11 U.S.C. § 544(b) and 740 ILCS 160/5(a)(1)
### (against Coari)

173.    The Trustee re-alleges the allegations set forth above.

174.    At the time CGI entered the Coari Redemption Agreement and paid the Coari
Redemption Amount, CGI had multiple creditors holding unsecured, allowable claims who could
have voided the transactions discussed in this Count.

175.     For this reason, and for the reasons set forth in Count 11, the Trustee seeks to avoid

the Coari Redemption Agreement and the payment of the Coari Redemption Amount.

### Count 13 – Breach of Fiduciary Duty Related to Kumkoski Stock Redemptions
### (against Kubis)

176.     The Trustee re-alleges the allegations set forth in the above paragraphs.

177.     As an officer of CGI, Kubis owed the fiduciary duties of good faith and loyalty

under Illinois law, obligating him to act in good faith, with candor and full disclosure of material

information, and in the best interests of CGI.

178.     Kubis breached his fiduciary duties to CGI by acting with a purpose other than that

of advancing CGI's best interests, by failing to act in good faith, with candor and full disclosure

of material information, and by failing to act in the face of a known duty to act, demonstrating a

conscious disregard for his duties with respect to the execution of the Kumkoskis' July 2016 Class

B share redemption.   Specifically, Kubis breached his fiduciary duties to CGI by issuing the

Kumkoskis a full cash redemption for their Class B holdings upon request even though CGI's By-

laws only allowed it to redeem the Kumkoskis' stock by way of a promissory note with a five-year

term.  In so doing, Kubis acted in bad faith and failed to consider the best interests of CGI.

179.     Kubis also violated his duty of loyalty to CGI because his motivation for failing to

pay the Kumkoskis via a promissory note for their Class B shares was likely that Kubis intended

to engineer his own Class B share redemption through a cash payment.

180.     As a direct and proximate result of his breach of fiduciary duty, Kubis caused CGI

to suffer substantial damages, including approximately $867,252, which is the amount CGI paid

to redeem the Kumkoskis' Class B shares, and $67,776, which is the amount of the Kumkoskis'

Class B share value that Kubis caused CGI to credit against other amounts owed by the Kumkoskis.

**Count 14 – Avoidance of Fraudulent Transfers Related to
Kumkoski Stock Redemptions Pursuant to 11 U.S.C. § 548(a)(1)(B)
(against Joseph Kumkoski and Frank Kumkoski)**

181.     The Trustee re-alleges the allegations set forth in the above paragraphs.

182.     On or about July 21, 2016, CGI transferred $401,200 to Frank Kumkoski (or a CGI member controlled by him) (the "Frank Transfer") and credited $65,000 against a loan owed by Frank Kumkoski (or a CGI member controlled by him) (the "Frank Credit").  On the same day, CGI transferred $466,052 to Joe Kumkoski (or a CGI member controlled by him) (the "Joe Transfer") and credited $2,776 against other monies owing to CGI by Joe Kumkoski (or a CGI member controlled by him) (the "Joe Credit").

183.     CGI received no value, and certainly not reasonably equivalent value, for making the Frank Transfer or the Joe Transfer, or for applying the Joe Credit or the Frank Credit.  CGI had no pre-existing obligation to purchase the Kumkoskis' Class B stock.  To the contrary, under CGI's By-laws, it was allowed to only pay the Kumkoskis via a five-year promissory note, which note would include the right to defer payment in the case of CGI's financial hardship.

184.     On July 21, 2016, CGI—

- was insolvent;

- was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital; and

- intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured.

185.     CGI's making the Frank Transfer and the Joe Transfer, and its applying the Joe Credit and the Frank Credit, constituted transfers of CGI's property made within two years of CGI's May 2, 2017, petition date.

186.    For these reasons, the Trustee seeks to avoid the Frank Transfer, the Joe Transfer, the Frank Credit, and the Joe Credit pursuant to 11 U.S.C. § 548(a)(1)(B).

### Count 15 – Avoidance of Fraudulent Obligations Related to Kumkoski Stock Redemptions Pursuant to 11 U.S.C. § 544(b)(1), 740 ILCS 160/5(a)(2) and 740 ILCS 160/6(a) (against Joseph and Frank Kumkoski)

187.    The Trustee re-alleges the allegations set forth above.

188.    On July 21, 2016, CGI had multiple creditors holding unsecured, allowable claims who could have voided those transactions.

189.    CGI did not receive reasonably equivalent value for making the Frank Transfer or the Joe Transfer, or for applying the Frank Credit or the Joe Credit.

190.    On July 21, 2016, CGI—

- was insolvent;

- was engaged in a business or transaction, or was about to engage in a business or transaction, for which CGI had unreasonably small capital; and

- intended to incur, or believed that it would incur, debts that were beyond its ability to pay as such debts matured.

191.    CGI's making the Frank Transfer and the Joe Transfer, and applying the Frank Credit and the Joe Credit, constituted transfers of CGI's property.

192.    For these reasons, the Trustee seeks to avoid the Frank Transfer, the Joe Transfer, the Frank Credit, and the Joe Credit pursuant to 11 U.S.C. § 544(b)(1), 740 ILCS 160/5(a)(2) and 740 ILCS 160/6(a).

### Count 16 – Avoidance of Preferential Transfers Pursuant to 11 U.S.C. § 547 (Against Lavelle Law)

193.    The Trustee re-alleges the allegations set forth in the above paragraphs.

194.   Lavelle Law was an insider of CGI.  Kerry Lavelle, the founding partner and sole name partner of Lavelle Law, served as the outside general counsel for CGI for many years, including the twelve months prior to the Petition Date.

195.   Within one year before CGI's May 2, 2017, bankruptcy filing, CGI made numerous transfers to Lavelle Law to pay invoices for legal work purportedly performed by Lavelle Law, primarily through Kerry Lavelle.  Those transfers (the "Lavelle Law Transfers") included the following:

| Check No | Check Amt | Check Date | Clear Date |
|---|---|---|---|
| 944841 | $ 20,246.05 | 05/16/2016 | 05/23/2016 |
| 946374 | $ 1,924.19 | 06/01/2016 | 06/08/2016 |
| 947372 | $ 21,721.15 | 06/15/2016 | 06/22/2016 |
| 948116 | $ 3,384.78 | 06/20/2016 | 06/27/2016 |
| 950229 | $ 21,319.42 | 07/15/2016 | 07/22/2016 |
| 952559 | $ 21,546.30 | 08/15/2016 | 08/22/2016 |
| 956333 | $ 13,525.34 | 10/03/2016 | 10/10/2016 |
| 959154 | $ 14,134.86 | 11/01/2016 | 11/08/2016 |
| 961674 | $ 53,606.53 | 12/01/2016 | 12/08/2016 |
| 962746 | $ 40,606.83 | 12/15/2016 | 12/22/2016 |
| 965298 | $ 22,216.40 | 01/16/2017 | 01/23/2017 |
| 968191 | $ 26,917.47 | 02/24/2017 | 02/28/2017 |
| 970104 | $ 82,648.05 | 03/23/2017 | 03/28/2017 |
| 971971 | $ 79,809.68 | 04/17/2017 | 04/20/2017 |

196.   The Lavelle Law Transfers constitute transfers of an interest in CGI's property.

197.   The Lavelle Law Transfers were made to or for the benefit of Lavelle Law, which was a creditor of CGI.

198.   The Lavelle Law Transfers were made for or on account of one or more antecedent debts owed by CGI to Lavelle Law prior to the date on which such transfers were made.

199.   CGI was insolvent when the Lavelle Law Transfers were made.

45

Case 19-01011   Doc 1   Filed 11/19/19   Entered 11/19/19 10:39:06   Desc Main
Document      Page 50 of 62

200.    The Lavelle Law Transfers enabled Lavelle Law to receive more than it would have received if: (a) such transfers had not been made; and (b) Lavelle Law had received payment of the underlying debt pursuant to chapter 7 of the Bankruptcy Code.

201.    Accordingly, the Trustee seeks to avoid The Lavelle Law Transfers pursuant to 11 U.S.C. § 547(b).

**Count 17 – Recovery of Avoided Transfers Pursuant to 11 U.S.C. § 550(a)**

202.    The Trustee re-alleges the allegations set forth in the above paragraphs.

203.    For the reasons set forth above, the following transfers are all subject to avoidance:

- the Kubis Redemption Agreement;
- the Escrow Agreement;
- the Escrow Release Notice;
- CGI's payment of the Kubis Redemption Amount;
- Lavelle Law's payments to Kubis from escrow;
- the Coari Redemption Agreement;
- CGI's payment of the Coari Redemption Amount;
- the Frank Transfer;
- the Joe Transfer;
- the Frank Credit;
- the Joe Credit; and
- the Lavelle Law Transfers.

204.    Defendant Kubis was an initial transferee of the rights CGI transferred pursuant to the Kubis Redemption Agreement, the Escrow Agreement, and the Escrow Release Notice, and

46

he was an initial transferee of CGI's payment of the Kubis Redemption Amount or a subsequent

transferee of that portion of the Kubis Redemption Amount paid him by Lavelle Law.

205.    Defendant Lavelle Law was an initial transferee of the rights CGI transferred

pursuant to the Escrow Agreement.  In the alternative to the claims against Kubis regarding his

transferee status, Defendant Lavelle Law was an initial transferee of CGI's payment of the Kubis

Redemption Amount or the portion of the Kubis Redemption Amount Lavelle Law has not

transferred to Kubis.

206.    Defendant Coari was an initial transferee of the rights CGI transferred under the

Coari Redemption Agreement and of CGI's payment of the Coari Redemption Amount.

207.    Defendant Frank Kumkoski was the initial transferee of the Frank Transfer and the

Frank Credit.

208.    Defendant Joe Kumkoski was the initial transferee of the Joe Transfer and the Joe

Credit.

209.    Defendant Lavelle Law was the initial transferee of the Lavelle Law Transfers.

210.    Accordingly, pursuant to 11 U.S.C. § 550(a)(1) seeks to recover:

a.    From Defendant Kubis, (i) the rights CGI transferred in the Kubis
Redemption Agreement, the Escrow Agreement, and the Escrow Release
Notice, and the property, or the value thereof, and (ii) the cash CGI paid
when it paid the Kubis Redemption Amount, or the value thereof, or the
cash Kubis received from Lavelle Law as escrowee, or the value thereof;

b.    From Defendant Lavelle Law, and in the alternative to recovery from Kubis
for the full amount of the Kubis Redemption Amount, the amount of the
Kubis Redemption Payment that Lavelle Law has not paid to Kubis, plus
any interest accumulated on that unpaid amount;

c.    From Defendant Coari, (i) the rights CGI transferred in the Coari
Redemption Agreement, and (ii) the money CGI paid when it paid the Coari
Redemption Amount, or the value thereof;

d.     From Defendant Frank Kumkoski, (i) the Frank Transfer, or the value thereof, and (ii)the rights CGI transferred when it applied the Frank Credit;

e.     From Defendant Joseph Kumkoski, (i) the Joe Transfer, or the value thereof, and (ii) the rights CGI transferred when it applied the Joe Credit;

f.     From Defendant Lavelle Law, the Lavelle Law Transfers, or the value thereof.

### Count 18 – Breach of Fiduciary Duty Related to Improper Rebate
### (against the CGI Directors)

211.    The Trustee re-alleges the allegations set forth in the above paragraphs.

212.    As members of the CGI Board, the CGI Directors owed the fiduciary duties of good faith and loyalty under Illinois law, obligating them to act in good faith, with candor and full disclosure of material information, and in the best interests of CGI.

213.    The CGI Directors breached their fiduciary duties of good faith and loyalty to CGI by acting in their own self-interest and with a purpose other than that of advancing CGI's best interests, by failing to act in good faith, with candor and full disclosure of material information, and by demonstrating a conscious disregard for their duties with respect to the implementation of the September 2016 patronage rebate. Their breaches included the following:

a.     Failing to consider material information provided by CGI's officers concerning the advisability of approving the September 2016 patronage rebate;

b.     Recommending that CGI approve the September 2016 patronage rebate despite knowing it would push CGI deeper into insolvency;

c.     Ignoring information related to the financial condition of CGI and its subsidiaries prior to approving the September 2016 patronage rebate;

d.     Pushing CGI beyond the brink of insolvency by approving the September 2016 patronage rebate; and

e.     Recommending approval of the September 2016 patronage rebate in pursuit of their own financial interests to the detriment of CGI's.

214.    As a direct and proximate result of their breaches of fiduciary duty, the CGI Directors caused CGI to suffer substantial damages, including approximately $21.34 million, which is the amount of the September 2016 patronage rebate that CGI ultimately paid out to its members after the CGI Director Defendants voted to approve the rebate.

**Count 19 – Improper Distribution Pursuant to 805 Ill. Comp. Stat. Ann. 5/9.10
(against the CGI Directors)**

215.    The Trustee incorporates the foregoing allegations.

216.    In September 2016, the CGI Directors approved a $44.5 million patronage rebate. CGI paid out 70% of the patronage rebate to its members the following month, less what had previously been paid out in quarterly installments.

217.    The September 2016 patronage rebate was a corporate distribution within the meaning of 805 Ill. Comp. Stat. Ann. 5/9.10.

218.    The CGI Directors approved the September 2016 patronage rebate while CGI was insolvent.  Alternatively, CGI's net assets would be less than zero or less than the maximum amount payable at the time of distribution to shareholders having preferential rights in liquidation if CGI was liquidated after payment of the September 2016 rebate.

219.    The September 2016 patronage rebate, therefore, comprises an improper distribution, and it caused CGI damages in the amount of the improper distribution.

220.    The CGI Directors are jointly and severally liable to CGI for the amount of this improper distribution pursuant to 805 Ill. Comp. Stat. Ann. 5/8.65(a)(1).

**Count 20 – Breach of Fiduciary Duty Related to Underfunded Buying Deposit Accounts
(against the CGI Directors, Nemeth, and Kubis)**

221.    The Trustee re-alleges the allegations set forth in the above paragraphs.

222.     As members of the CGI Board, the CGI Directors owed the fiduciary duties of care, good faith and loyalty under Illinois law, obligating them to act with due care, in good faith, with candor and full disclosure of material information, and in the best interests of CGI.

223.     As officers of CGI (or acting as officers of CGI in the case of Kubis), Nemeth and Kubis owed CGI fiduciary duties of care, good faith and loyalty under Illinois law, obligating them to act with due care, in good faith, with candor and full disclosure of material information, and in the best interests of CGI.

224.     The CGI Directors, Kubis, and Nemeth breached their fiduciary duties of care, good faith and loyalty to CGI by acting in their own self-interest and with a purpose other than that of advancing CGI's best interests, by failing to act in good faith, with candor and full disclosure of material information, and by demonstrating a conscious disregard for their duties with respect to the maintenance of CGI Members' Buying Deposit requirements.

225.     They breached their duties by failing to require, or to take any significant steps to require, CGI Members to maintain their Buying Deposit requirements in accordance with CGI's By-laws, Rules and Regulations, and Membership Applications.  This failure was particularly significant once the value of CGI's Class B shares declined, leaving CGI woefully unprotected should CGI Members fail to pay the amounts they owed CGI for grocery purchases, loans, or other amounts.

226.     Many of the CGI Directors had a personal motive for failing to require Members to properly maintain their Buying Deposit requirements in that many of the stores they owned or managed were deficient in fulfilling their own Buying Deposits requirements.

227.     As a direct and proximate result of their breaches of fiduciary duty, the CGI Directors, Nemeth, and Kubis caused CGI to suffer at least $8.46 million in damages when CGI

Members failed to pay the amounts they owed CGI, and those Members' Buying Deposits were insufficient to cover the amounts owed.

**Count 21 – Equitable Subordination Pursuant to 11 U.S.C. § 510(b)**
**(against Cortesi, Dremonas, Ingraffia, Kamberos, Kotara,**
**Lagestee, Lee, Linares, Presta, Regas, and Robertson)**

228.    The Trustee re-alleges the allegations set forth in the above paragraphs.

229.    Claims have been filed or scheduled in CGI's bankruptcy case on behalf of Defendants Cortesi, Dremonas, Ingraffia, Kamberos, Kotara, Lagestee, Lee, Linares, Presta, Regas, and Robertson, including the following claims:

      a.    A scheduled claim in the amount of $1,500 for Cortesi;

      b.    A scheduled claim in the amount of $1,500 for Dremonas;

      c.    A scheduled claim in the amount of $1,500 for Ingraffia;

      d.    A scheduled claim in the amount of $1,500 for Kamberos;

      e.    A scheduled claim in the amount of $1,500 for Kotara;

      f.    A scheduled claim in the amount of $1,500 for Lagestee;

      g.    A scheduled claim in the amount of $1,500 for Lee

      h.    A scheduled claim in the amount of $1,500 for Linares;

      i.    A scheduled claim in the amount of $1,500 for Presta;

      j.    A scheduled claim in the amount of $1,500 for Regas;

      k.    A scheduled claim in the amount of $1,500 for Robertson; and

      l.    Filed claims on behalf of "James T. Robertson, successor in interest to 926 E. 9th St. Corp. a dissolved corp (Store # 2804)" and in the following amounts:

            i.    $104,930.00 (Claim #1145);

            ii.    $104,930.00 (Claim #1188);

            iii.    $37,902.00 (Claim #1181); and

            iv.    $37,902.00 (Claim #1139).

230.    These defendants engaged in inequitable conduct with respect to CGI. Their inequitable conduct not only injured CGI and its creditors, but also provided them with an unfair advantage or benefit, including a substantial patronage rebate.

231.    Equitable subordination of the claims of these defendants is not inconsistent with the Bankruptcy Code. Rather, equitable subordination of these claims redresses the underlying inequitable conduct that directly harmed CGI and its creditors.

232.    Accordingly, the Trustee requests that the claims of these Defendants be equitably subordinated to the claims of all other creditors pursuant to 11. U.S.C. § 510(c).

**Count 22 – Objection to Claim**
**(against Cortesi)**

233.    The Trustee re-alleges the allegations set forth in the above paragraphs.

234.    Claims have been filed or scheduled on Cortesi's behalf in CGI's bankruptcy case, including a claim in the amount of $1,500.

235.    The Trustee hereby objects to these claims because: (a) the claims should be equitably subordinated pursuant to section 510(c) of the Bankruptcy Code;  and (b) the claims are subject to set off, recoupment, and/or withholding based upon the causes of action asserted against Cortesi in this action pursuant to section 502(b)(1) of the Bankruptcy Code and other applicable law.

**Count 23 – Objection to Claim**
**(against Dremonas)**

236.    The Trustee re-alleges the allegations set forth in the above paragraphs.

237.    A claim has been scheduled on Dremonas's behalf in CGI's bankruptcy case in the amount of $1,500.

238.    The Trustee hereby objects to this claim because: (a) the claim should be equitably subordinated pursuant to section 510(c) of the Bankruptcy Code;  and (b) the claim is subject to

set off, recoupment, and/or withholding based upon the causes of action asserted against Dremonas

in this action pursuant to section 502(b)(1) of the Bankruptcy Code and other applicable law.

## Count 24 – Objection to Claim
### (against Ingraffia)

239.    The Trustee re-alleges the allegations set forth in the above paragraphs.

240.    A claim has been scheduled on Ingraffia's behalf in CGI's bankruptcy case in the

amount of $1,500.

241.    The Trustee hereby objects to this claim because: (a) the claim should be equitably

subordinated pursuant to section 510(c) of the Bankruptcy Code;  and (b) the claim is subject to

set off, recoupment, and/or withholding based upon the causes of action asserted against Ingraffia

in this action pursuant to section 502(b)(1) of the Bankruptcy Code and other applicable law.

## Count 25 – Objection to Claim
### (against Kamberos)

242.    The Trustee re-alleges the allegations set forth in the above paragraphs.

243.    A claim has been scheduled on Kamberos's behalf in CGI's bankruptcy case in the

amount of $1,500.

244.    The Trustee hereby objects to this claim because: (a) the claim should be equitably

subordinated pursuant to section 510(c) of the Bankruptcy Code;  and (b) the claim is subject to

set off, recoupment, and/or withholding based upon the causes of action asserted against Kamberos

in this action pursuant to section 502(b)(1) of the Bankruptcy Code and other applicable law.

## Count 26 – Objection to Claim
### (against Kotara)

245.    The Trustee re-alleges the allegations set forth in the above paragraphs.

246.    A claim has been scheduled on Kotara's behalf in CGI's bankruptcy case in the

amount of $1,500.

247.     The Trustee hereby objects to this claim because: (a) the claim should be equitably subordinated pursuant to section 510(c) of the Bankruptcy Code;  and (b) the claim is subject to set off, recoupment, and/or withholding based upon the causes of action asserted against Kotara in this action pursuant to section 502(b)(1) of the Bankruptcy Code and other applicable law.

### Count 27 – Objection to Claim
### (against Lagestee)

248.     The Trustee re-alleges the allegations set forth in the above paragraphs.

249.     A claim has been scheduled on Lagestee's behalf in CGI's bankruptcy case in the amount of $1,500.

250.     The Trustee hereby objects to this claim because: (a) the claim should be equitably subordinated pursuant to section 510(c) of the Bankruptcy Code;  and (b) the claim is subject to set off, recoupment, and/or withholding based upon the causes of action asserted against Lagestee in this action pursuant to section 502(b)(1) of the Bankruptcy Code and other applicable law.

### Count 28 – Objection to Claim
### (against Lee)

251.     The Trustee re-alleges the allegations set forth in the above paragraphs.

252.     A claim has been scheduled on Lee's behalf in CGI's bankruptcy case in the amount of $1,500.

253.     The Trustee hereby objects to this claim because: (a) the claim should be equitably subordinated pursuant to section 510(c) of the Bankruptcy Code;  and (b) the claim is subject to set off, recoupment, and/or withholding based upon the causes of action asserted against Lee in this action pursuant to section 502(b)(1) of the Bankruptcy Code and other applicable law.

### Count 29 – Objection to Claim
### (against Linares)

254.     The Trustee re-alleges the allegations set forth in the above paragraphs.

255.     A claim has been scheduled on Linares's behalf in CGI's bankruptcy case in the amount of $1,500.

256.     The Trustee hereby objects to this claim because: (a) the claim should be equitably subordinated pursuant to section 510(c) of the Bankruptcy Code;  and (b) the claim is subject to set off, recoupment, and/or withholding based upon the causes of action asserted against Linares in this action pursuant to section 502(b)(1) of the Bankruptcy Code and other applicable law.

### Count 30 – Objection to Claim
### (against Presta)

257.     The Trustee re-alleges the allegations set forth in the above paragraphs.

258.     A claim has been scheduled on Presta's behalf in CGI's bankruptcy case in the amount of $1,500.

259.     The Trustee hereby objects to this claim because: (a) the claim should be equitably subordinated pursuant to section 510(c) of the Bankruptcy Code; and (b) the claim is subject to set off, recoupment, and/or withholding based upon the causes of action asserted against Presta in this action pursuant to section 502(b)(1) of the Bankruptcy Code and other applicable law.

### Count 31 – Objection to Claim
### (against Regas)

260.     The Trustee re-alleges the allegations set forth in the above paragraphs.

261.     A claim has been scheduled on Regas's behalf in CGI's bankruptcy case in the amount of $1,500.

262.     The Trustee hereby objects to this claim because: (a) the claim should be equitably subordinated pursuant to section 510(c) of the Bankruptcy Code;  and (b) the claim is subject to set off, recoupment, and/or withholding based upon the causes of action asserted against Regas in this action pursuant to section 502(b)(1) of the Bankruptcy Code and other applicable law.

## Count 32 – Objection to Claim
### (against Robertson)

263.    The Trustee re-alleges the allegations set forth in the above paragraphs.

264.    A claim has been scheduled on Robertson's behalf in CGI's bankruptcy case in the amount of $1,500.

265.    The Trustee hereby objects to this claim because: (a) the claim should be equitably subordinated pursuant to section 510(c) of the Bankruptcy Code;  and (b) the claim is subject to set off, recoupment, and/or withholding based upon the causes of action asserted against Robertson in this action pursuant to section 502(b)(1) of the Bankruptcy Code and other applicable law.

## CONDITIONS PRECEDENT

266.    All conditions precedent to the Trustee's claims for relief have been performed or have occurred.

## TOLLING OF LIMITATIONS

267.    Any statute of limitations applicable to the Trustee's claims was tolled for two years after the filing of the Debtors' bankruptcy cases, pursuant to section 108(a) of the Bankruptcy Code.  In addition, the statutory deadline for the Trustee to assert certain other claims under the Bankruptcy Code was extended to at least two years after the filing of CGI's bankruptcy case, pursuant to section 546(a) of the Bankruptcy Code.

268.    On or about May 1, 2019, prior to the end of this two-year period, the Trustee and Defendants entered into a written tolling agreement and into a subsequent extension of the tolling agreement, which further tolled any statute of limitations or other deadlines applicable to the Trustee's claims until December 15, 2019.

## JURY DEMAND

269.    The Trustee demands a trial by jury for all issues.

## **PRAYER**

WHEREFORE, the Trustee respectfully requests that the Court enter judgment in favor of

the Trustee and against Defendants as follows:

a.      awarding compensatory, consequential, and/or monetary damages in an amount to be determined at trial, but in an amount of at least $80 million;

b.      awarding the recovery of avoided transfers in the total amount of approximately $4.75 million;

c.      disgorging all salaries, bonuses, and other compensation paid to Defendants during the time that they were breaching their fiduciary duties;

d.      disgorging all profits and other proceeds obtained by Defendants from redeeming their stock in CGI during the time that they were breaching their fiduciary duties, including the nearly $3.5 million obtained by Kubis and Coari from redeeming their Class B shares during the one-year period before CGI filed bankruptcy;

e.      equitably subordinating any claims filed or scheduled on behalf of Defendants pursuant to section 510(c) of the Bankruptcy Code;

f.      disallowing any claims filed or scheduled on behalf of Defendants pursuant to section 502(b) of the Bankruptcy Code;

g.      awarding pre-judgment and post-judgment interest at the maximum rate permitted by law or equity;

h.      awarding reasonable attorney's fees and expenses, together with all costs of court; and

i.      granting such other and further relief, at law or in equity, as this Court deems just and proper.

Dated: November 19, 2019                    Respectfully submitted,

*/s/ Eric D. Madden*
Eric D. Madden (admitted *pro hac vice*)
J. Benjamin King (admitted *pro hac vice*)
Leo B. Oppenheimer (admitted *pro hac vice*)
REID COLLINS & TSAI LLP
1601 Elm Street, Suite 4200
Dallas, TX 75201

(214) 420-8900 (T)
(214) 420-8909 (F)
emadden@rctlegal.com
bking@rctlegal.com
loppenheimer@rctlegal.com

*Special Litigation Counsel to
Howard B. Samuels, Chapter 7 Trustee for the
Estates of Central Grocers, Inc., Strack and
Van Til Super Market, Inc., and SVT, LLC*

-and-

Michael M. Eidelman
William W. Thorsness
Allison B. Hudson
VEDDER PRICE P.C.
222 North LaSalle Street, Suite 2600
Chicago, Illinois 60601
(312) 609-7500 (T)
(312) 609-5005 (F)
meidelman@vedderprice.com
wthorsness@vederprice.com
ahudson@vedderprice.com

*Counsel to Howard B. Samuels, Chapter 7
Trustee for the Estates of Central Grocers,
Inc., Strack and Van Til Super Market, Inc.,
and SVT, LLC*