**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| JUDGE | Janet S. Baer | **Case No.** | 17 B 13886 |
|---|---|---|---|
| DATE | November 9, 2021 | **Adversary No.** | 19 A 01011 |
| CASE TITLE | Howard B. Samuels v. John Coari, John Cortesi, Anthony Dal Pra, James Dremonas, Tony Ingraffia, Maria Kamberos, John Kotara, Timothy Kubis, Joseph Kumkoski, Frank Kumkoski, John Lagestee, Sr., Kerry Lavelle, Robert Lee, Alfredo Linares, Kenneth Nemeth, Robertino Presta, John Regas, James Robertson, John Sullivan, and Lavelle Law, Ltd. (In re Central Grocers, Inc., et al.) | | |
| TITLE OF ORDER | Order Granting Defendants' Motion to Dismiss Trustee's Adversary Complaint (ECF No. 81) | | |

**DOCKET ENTRY TEXT**

The motion filed by defendants John Cortesi, Anthony Dal Pra, James Dremonas, Tony Ingraffia, Maria Kamberos, John Kotara, Timothy Kubis, John Lagestee, Sr., Robert Lee, Alfredo Linares, Kenneth Nemeth, Robertino Presta, John Regas, James Robertson, and John Sullivan to dismiss Counts 18–32 of the adversary complaint filed by plaintiff-trustee Howard B. Samuels is granted in its entirety. Counts 18 and 19 are dismissed with prejudice. Counts 20–32 are dismissed without prejudice, and the Trustee may replead those counts consistent with this order. This matter is continued for status to December 15, 2021 at 2:00 p.m.
**[For further details see text below.]**

## STATEMENT

This matter is before the Court on the motion of defendants John Cortesi, Anthony Dal Pra, James Dremonas, Tony Ingraffia, Maria Kamberos, John Kotara, Timothy Kubis, John Lagestee, Sr., Robert Lee, Alfredo Linares, Kenneth Nemeth, Robertino Presta, John Regas, James Robertson, and John Sullivan (collectively, the "Defendants") to dismiss Counts 18–32 of the adversary complaint filed by plaintiff Howard B. Samuels (the "Trustee"), solely as chapter 7 trustee of the estates of Central Grocers, Inc. ("CGI"), Stack and Van Til Super Market, Inc. ("Strack"), and SVT, LLC ("SVT"), for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure (made applicable to adversary proceedings by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure).[1] For the reasons that follow, the Court grants the Defendants' motion to dismiss on all counts. Counts 18 and 19 are dismissed with prejudice. Counts 20–32 are dismissed without prejudice, and the Trustee is given leave to replead those counts consistent with this order.

---

[1] Unless otherwise noted, all statutory and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101 to 1532, and the Federal Rules of Bankruptcy Procedure, respectively.

## JURISDICTION

Under 28 U.S.C. § 1334(a), federal district courts have "original and exclusive jurisdiction" of all cases under title 11 of the United States Code. 28 U.S.C. § 1334(a). The district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under the Bankruptcy Code or arising in or related to cases under the Code. 28 U.S.C. § 1334(b). Pursuant to 28 U.S.C. § 157(a), district courts may refer any or all of these cases to bankruptcy judges for their district. 28 U.S.C. § 157(a). Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois provides for the referral of all bankruptcy cases to the United States Bankruptcy Court for the Northern District of Illinois.

In cases that have been referred, bankruptcy judges must determine whether matters are core or noncore proceedings. 28 U.S.C. § 157(b)(3). If matters are core proceedings, which include those arising either under the Bankruptcy Code or in a case thereunder, *see* 28 U.S.C. § 157(b)(2), then the bankruptcy judge may hear and determine them and has statutory authority to enter a final judgment. 28 U.S.C. § 157(b)(1). If, however, matters are noncore, the bankruptcy judge may hear the matters but cannot decide them without the consent of the parties. 28 U.S.C. § 157(c). Absent consent, the bankruptcy court must "submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1).

In addition to statutory authority, bankruptcy judges must have constitutional authority to hear and determine matters. *Stern v. Marshall*, 564 U.S. 462, 480 (2011). "Constitutional authority exists when a matter originates under the Bankruptcy Code or, in noncore matters, where the matter is either one that falls within the public rights exception or where the parties have consented, either expressly or impliedly, to the bankruptcy court hearing and determining the matter." *Handler v. Moore (In re Moore)*, 620 B.R. 617, 625 (Bankr. N.D. Ill. 2020) (internal citation omitted) (citing *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 669 (2015), and *Richer v. Morehead*, 798 F.3d 487, 490 (7th Cir. 2015)).

Here, the Trustee asserts several core matters under 28 U.S.C. §§ 157(b)(2)(A), (B), and (O). As for the others, the Trustee has explicitly consented to the Court hearing and determining the noncore matters. (Adv. No. 19 A 01011, Dkt. 1 ¶ 12.) The Defendants have not objected to the Court's authority and therefore impliedly consent. As such, the Court has authority to hear and determine the Defendants' motion to dismiss both the core and noncore matters in the complaint.

## FACTUAL BACKGROUND

On a Rule 12(b)(6) motion to dismiss, the Court accepts as true the well-pleaded factual allegations in the complaint and draws all reasonable inferences from the facts in favor of the non-movant. *See Killingsworth v. HSBC Bank Nev., N.A.,* 507 F.3d 614, 618 (7th Cir. 2007); *Hernandez v. City of Goshen,* 324 F.3d 535, 537 (7th Cir 2003). "[T]he Court [also] considers the exhibits attached to the complaint, [and] where an exhibit conflicts with the allegations of the complaint, the exhibit typically controls." *LaSalle Bank Nat'l Assoc. v. Paramont Props.*, 588 F. Supp. 2d 840, 848 (N.D. Ill. 2008) (citing *Centers v. Centennial Mortg., Inc.*, 398 F.3d 930, 933

(7th Cir. 2005)). In this matter, the material facts, most of which are taken directly from the adversary complaint, are as follows.[2]

For almost 100 years, CGI was a grocery cooperative, which sold wholesale grocery products to retail grocery stores. (Compl. ¶¶ 2, 34, 43.) CGI owned 81% of Strack, which, in turn, owned 99% of SVT, a retail subsidiary that operated numerous grocery stores. (*Id.* ¶¶ 6, 37.) Beginning in 2015, CGI's business began to falter, largely because of declines in the sales of SVT, CGI's largest customer. (*Id.* ¶¶ 37, 44–49.) Those declines produced a corresponding drop in CGI's cash flow, causing the grocery cooperative to eventually exhaust its credit with its banks and ultimately forcing it into bankruptcy on May 2, 2017 (the "Petition Date"). (*Id.* ¶¶ 51–53.)

From at least January 2014 to April 2017, the CGI board of directors (the "CGI Board") consisted of thirteen people, all of whom are defendants seeking dismissal in this matter: John Cortesi, Anthony Dal Pra, James Dremonas, Tony Ingraffia, Maria Kamberos, John Kotara, John Lagestee, Sr., Robert Lee, Alfredo Linares, Robertino Presta, John Regas,[3] James Robertson, and John Sullivan[4] (together, the "CGI Directors" or the "Directors"). (*Id.* ¶¶ 15–20, 25–27, 29–32, 34.) Kotara also served as chairman of the CGI Board. (*Id.* ¶ 20.) During the same time period, all CGI Directors were owners, officers, or representatives of CGI customers, which CGI referred to as its "Members."[5] (*Id.* ¶ 34.)

The two other defendants who are pursuing dismissal here were officers of CGI. Kenneth Nemeth was the company's Chief Executive Officer from February 2015 to April 2017; he also served as one of Strack's directors from November 2013 to April 2017. (*Id.* ¶ 28.) Timothy Kubis was CGI's Chief Financial Officer from January 2014 to July 2016; subsequently, from July 2016 to April 2017, he served as CGI's "CFO Consultant." (*Id.* ¶ 21.)

Among the benefits enjoyed by its customers, CGI distributed profits from its wholesale operations to qualifying Members through annual dividends known as "patronage rebates." (*Id.* ¶ 36.) Two provisions of Article XII of CGI's Amended and Restated By-Laws, effective November 3, 2012 (the "Bylaws"), are relevant here. First, pursuant to section 1, the CGI Board

---

[2] Unless otherwise noted, all references to the docket ("Dkt.") are to Adversary No. 19 A 01011, and all citations to the record are to facts in the Trustee's complaint ("Compl.) in that adversary, filed on November 19, 2019 at Docket No. 1.

[3] On October 21, 2020, the Court entered an order appointing Rosie Regas as special representative of deceased defendant John Regas and substituting her as a defendant for Mr. Regas in this adversary proceeding. (Dkt. 170.)

[4] On July 14, 2021, the Court entered an order appointing June Sullivan as special representative of the deceased defendant John Sullivan and substituting her as a defendant for Mr. Sullivan in this adversary proceeding. (Dkt. 205.)

[5] Pursuant to CGI's Bylaws (defined below), a "Member" is defined as an "Associate Member" or a "Regular Member." (Dkt. 81-1 at 2.) An "Associate Member," in turn, is "any Person that has been accepted as an Associate Member of the Corporation in accordance with the provisions of Article V, Section 1 of the[] By-laws and owns five (5) Class A Shares"; a "Regular Member" is "any Person that has been accepted as a Regular Member of the Corporation" in accordance with the same provisions and under the same condition; and a "Person" is "an individual or an entity, including, but not limited to, a partnership, a corporation, a limited liability company or a trust." (*Id.* at 1–3.) The Court uses the general term "Member" in this Memorandum Opinion for purposes of simplicity.

3

was authorized to "set aside reasonable reserves from time to time by resolution as it deem[ed] appropriate to provide for any contingencies or expected losses of the Corporation and as it otherwise deem[ed] to be in the best interest of the Corporation." (Dkt. 81-1 at 30.) Section 2, in turn, provided for the patronage rebates themselves:

> The Corporation shall distribute to qualifying Members and Patrons as Patronage Rebates all of the Corporation's Rebateable Net Income in excess of such reserves, payments of debts, capital improvements or additions, and working capital requirements as the Board of Directors may from time to time determine. Such distributions shall be made in a manner based on Members' and Patrons' purchases from the Corporation's departments, in accordance with the provisions governing Patronage Rebates in the Rules and Regulations. For purposes of determining a Member's purchases from the Corporation's departments, all purchases by Persons in the same Related Group as the Member shall be aggregated. Distribution of Patronage Rebates from Rebateable Net Income of any fiscal year shall occur no later than eight and a half (8 ½) months following the end of the fiscal year. It is intended that Patronage Rebates qualify as "patronage dividends" within the meaning of Section 1388(a) of the Internal Revenue Code of 1986, as amended.

(*Id.*) Under the patronage rebate program, the CGI Board determined, at the start of every fiscal year, how much of CGI's profit to retain for debt service, capital improvements, working capital requirements, and protection against future contingencies, and any remaining profit was distributed to Members in good standing as a patronage dividend. (*Id.*; Compl. ¶ 36.) Each Member's rebate was based on the amount and type of goods that the Member bought from CGI during the prior year. (Compl. ¶ 36.)

In September 2016, the CGI Board met to consider, among other things, the annual patronage rebate. (*Id.* ¶ 83.) At the meeting, Kubis reported on CGI's deteriorating financial condition, noting, among other things, that the company's sales had decreased almost $100 million—down 6.7% from the prior year—and predicting that CGI would breach various loan covenants with its lenders in the following quarter. (*Id.* ¶¶ 83–87.) Despite the dire report on the company's financial situation, there was no discussion among the CGI Directors about retaining any portion of the rebate, either to improve the financial position of CGI or its subsidiaries or to protect against future contingencies. (*Id.* ¶ 88.)

Notwithstanding CGI's grave financial condition, the CGI Board approved the maximum allowable patronage rebate of $44.5 million for the fiscal year ending July 30, 2016 (the "Patronage Rebate"). (*Id.*) Thereafter, Kubis met with CGI's lenders, who insisted that the grocery cooperative defer payment of at least 30% of the Patronage Rebate as a condition for not declaring a default on the various loan covenants. (*Id.* ¶¶ 90–91.) On October 13, 2016, the CGI Board voted to comply with the lenders' request to hold back 30% of the Patronage Rebate until CGI could meet both its loan covenants and its budgetary goals for fiscal year 2017. (*Id.* ¶ 92.) Two weeks later, on October 27, 2016, CGI paid out to its qualifying Members $21.34 million of the Patronage

4

Rebate—the $44.5 million approved, less what had been previously paid in quarterly installments, less the 30% held back. (*Id.* ¶ 93.)

Exacerbating CGI's financial problems was a substantial deficit of "Buying Deposits" that the company could turn to if a Member failed to pay for groceries. (*Id.* ¶ 96.) Under a system designed to ensure that CGI was always paid for products that were purchased, each Member was required to maintain these cash deposits with the grocery cooperative in an amount equal to two times the Member's average weekly purchases.[6] (*Id.* ¶¶ 96–98; Dkt. 81-1 at 32–33.) These deposit requirements, however, were not enforced. (Compl. ¶ 105.) As a result, on the Petition Date, 333 Member stores owed CGI approximately $32.8 million for product, but CGI had cash deposits for those stores of only $4.7 million—a difference of $28.1 million. (*Id.* ¶ 100.)

On November 19, 2019, the Trustee filed an adversary complaint against various of CGI's insiders. At issue here are Counts 18–32 of the complaint. In those counts, the Trustee alleges that, by approving the Patronage Rebate and failing to enforce the Buying Deposit requirements, the Defendants breached their fiduciary duties of good faith, loyalty, and care to CGI. The Trustee also contends that the CGI Directors violated Illinois law by improperly distributing the Patronage Rebate. Finally, the Trustee asserts that, because the CGI Directors engaged in misconduct that injured CGI and provided the Directors with an unfair advantage, the claims of some of those Directors must be equitably subordinated, as well as set off, recouped, or withheld.

The Defendants have moved to dismiss Counts 18–32 under Rule 12(b)(6), arguing that the Trustee has failed to plead adequate causes of action upon which relief can be granted under any of those counts. As to the Patronage Rebate, the Defendants contend that they did not breach their duties by simply complying with CGI's Bylaws and honoring the company's obligations to its Members. With respect to the Buying Deposit accounts, the Defendants claim that, as directors and officers of CGI, they were responsible only for "significant corporate decisions"—not the "day-to-day minutiae" of the company's operations, including the monitoring of those accounts.

The motion to dismiss has been fully briefed. Having reviewed the relevant documents, the arguments of the parties, and the applicable case law, the Court is now ready to rule.

## RELEVANT PLEADING STANDARDS

A complaint challenged by a Rule 12(b)(6) motion to dismiss does not need "detailed factual allegations," but a plaintiff's obligation "to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (finding that the plaintiff must include more than "unadorned, the defendant-unlawfully-harmed-me accusation[s]"). Legal conclusions may help to structure a complaint, but they must be supported by factual allegations. *Iqbal*, 556 U.S. at 678–79.

---

[6] Section 8 of Article XII of the Bylaws provides, in part, that "each Member, Patron or Customer shall maintain with the Corporation Buying Deposits in an amount at least equal to the greater of (a) an amount fixed by the Rules and Regulations or (b) two (2) times each Person's average weekly purchases (such average determined over the preceding sixty (60) days)." (Dkt. 81-1 at 32–33.)

To survive a 12(b)(6) motion to dismiss, a complaint must clear "two easy-to-clear hurdles." *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007). First, the complaint must provide fair notice of the claim and the grounds upon which it rests so that a defendant can prepare his defense. *Cornielsen v. Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 598 (7th Cir. 2019). Second, the allegations must "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level.'" *Concentra Health Servs.*, 496 F.3d at 776 (quoting *Twombly*); *see also Killingsworth,* 507 F.3d at 618 (noting that the plaintiff must plead "'enough facts to state a claim to relief that is plausible on its face'"). Plausibility means that the allegations in a complaint permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *see also Nelson v. City of Chi.*, 992 F.3d 599, 603 (7th Cir. 2021). Accordingly, a complaint must include allegations about each element of the cause of action, or at least allegations from which a court can draw reasonable inferences about each element. *Twombly*, 550 U.S. at 562–63. Requiring "more than a sheer possibility that a defendant has acted unlawfully," *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556), plausibility does not require certainty. Rather, "the plaintiff must give enough details about the subject-matter of the case to present a story that holds together. In other words, the court will ask itself *could* these things have happened, not *did* they happen." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010).

When intent or mental state is an element of the plaintiff's claim, the same pleading requirements apply. *Iqbal*, 556 U.S. at 686–87. The plaintiff must allege facts that support a plausible inference of mental state; pleading intent merely as a conclusion is not sufficient. *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1327 (Fed. Cir. 2009) (noting that "[a]lthough 'knowledge' and 'intent' may be averred generally, our precedent, like that of several regional circuits, requires that the pleadings allege sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind"); *McCammon-Chase v. Circle Fam. Care, Inc.*, No. 09 C 7450, 2010 WL 2925893, at *9–10 (N.D. Ill. July 23, 2010) (dismissing because "the facts, as pled, [did] not show the requisite intent"); *see, e.g.*, *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 886 (7th Cir. 2012) (finding "conclusory allegations" of intent "insufficient under *Iqbal*").

## **DISCUSSION**

In his complaint, the Trustee alleges that the Defendants breached their fiduciary duties to CGI both by approving the payment of the Patronage Rebate to CGI's Members just seven months before the company's bankruptcy and by underfunding and otherwise failing to require Members to maintain their Buying Deposit accounts at a time when CGI was in serious financial trouble. The Trustee further contends that the Directors are jointly and severally liable to CGI under the Illinois Business Corporation Act, 805 ILCS 5/9.10, for improperly distributing the Patronage Rebate. Finally, the Trustee alleges that, because the CGI Directors engaged in "inequitable conduct" that both injured the cooperative and its creditors and provided the Directors with an unfair advantage or benefit, including a substantial Patronage Rebate, the scheduled or filed claims of some of those Directors should be equitably subordinated pursuant to § 510(b) and set off, recouped, or withheld under § 502(b)(1).

**Count 18 – Breach of Fiduciary Duties Related to the Patronage Rebate**
**(against the CGI Directors)**

In Count 18 of the complaint, the Trustee alleges that the CGI Directors breached their fiduciary duties of good faith and loyalty to CGI under Illinois law by: (1) acting in their own self-interests and with a purpose other than that of advancing CGI's best interests; (2) failing to act in good faith, with candor and full disclosure of material information; and (3) demonstrating a conscious disregard for their duties in connection with the approval and payment of the Patronage Rebate.[7] (Compl. ¶¶ 213–12.) Specifically, the Trustee alleges that the CGI Directors' breaches include:

(1) failing to consider material information provided by CGI's officers concerning the advisability of approving the Patronage Rebate;

(2) recommending that CGI approve the Patronage Rebate, despite knowing that approval and payment of that Rebate would push CGI deeper into insolvency;

(3) ignoring information related to the financial condition of CGI and its subsidiaries prior to approving the Patronage Rebate; and

(4) recommending approval of the Patronage Rebate in pursuit of their own financial interests to the detriment of CGI's.

(*Id.* ¶ 213.) As to the latter, the Trustee alleges that the CGI Directors approved the full Patronage Rebate because doing so financially benefitted their own Member stores. As a direct result of their breaches of fiduciary duty, the Trustee says, the Directors caused CGI to suffer substantial damages, including about $21.34 million—the amount of the Patronage Rebate that was ultimately paid to Members after the Rebate was approved. (*Id.* ¶ 214.)

A claim alleging a breach of fiduciary duty under Illinois law must set forth three elements: (1) that a fiduciary duty exists, (2) that such duty was breached, and (3) that the breach was the proximate cause of the plaintiff's injury. *Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 709 (7th Cir. 2010). Although the Trustee contends that his complaint provides allegations about all three elements, the parties' dispute in this matter centers on only the first.

With respect to that element, the Trustee argues that, as fiduciaries of CGI, the Directors owed the company the duties of loyalty, good faith, and care, which prohibited them from enhancing their "own personal interests at the expense of corporate interests." (Dkt. 105 at 6–7

---

[7] CGI was an Illinois corporation, and, therefore, the parties agree that Illinois law governs the dispute at issue. (Dkt. 81 at 1 n.2; Dkt. 105 at 6 n.30.) Because they do, and because a court has "no obligation to make an independent determination of what rule would apply" when there is no disagreement, the Court will apply Illinois law. *See In re Stoecker*, 5 F.3d 1022, 1029 (7th Cir. 1993); *see also Citadel Grp. Ltd. v. Wash. Reg'l Med. Ctr.*, 692 F.3d 580, 587 n.1 (7th Cir. 2012) ("We do not worry about conflict of laws unless the parties disagree on which state's law applies." (internal quotation omitted)); *Am. Home Assurance Co. v. Stone*, 61 F.3d 1321, 1324 (7th Cir. 1995).

7

(internal quotations omitted).) According to the Trustee, the Directors had discretion as to both the approval and the amount of the Patronage Rebate, and they exercised that discretion by voting for a distribution of the maximum allowable amount of more than $44 million to CGI's Members—including their own businesses—at a time when CGI was financially collapsing. In doing so, the Trustee says, the Directors breached their fiduciary duties to CGI by allowing their personal interests to prevent them from protecting the company's best interests.

In response, the CGI Directors argue that they had no discretion as to the approval or amount of the Patronage Rebate and, thus, no corresponding fiduciary duty to CGI with respect to the payment of that Rebate. Rather, the Directors contend, they were legally obligated to pay the Rebate pursuant to CGI's Bylaws, which required remittance of patronage rebates in accordance with § 1388(a) of the Internal Revenue Code. 26 U.S.C. § 1388(a). According to the Directors, in order for CGI's distribution of the Rebate to qualify as a "patronage dividend" under that statutory provision—allowing the company to exclude those funds from its gross income—the Directors could not exercise any discretion over the Rebate. In fact, the Directors argue, the Bylaws did not permit any reserves to be established after the fiscal year had begun, and, accordingly, the approval of the Patronage Rebate at the September 2016 board meeting was merely a ministerial act that approved payment pursuant to CGI's pre-existing obligations.

Section 1388(a) of the Internal Revenue Code provides, in relevant part, as follows:

> (a) **Patronage dividend.**–For purposes of this subchapter, the term "patronage dividend" means an amount paid to a patron by [a cooperative]–
>
> > (1) on the basis of quantity or value of business done with or for such patron,
> >
> > (2) under an obligation of such organization to pay such amount, which obligation existed before the organization received the amount so paid, and
> >
> > (3) which is determined by reference to the net earnings of the organization from business done with or for its patrons.
>
> Such term does not include any amount paid to a patron to the extent that (A) such amount is out of earnings other than from business done with or for patrons, or (B) such amount is out of earnings from business done with or for other patrons to whom no amounts are paid, or to whom smaller amounts are paid, with respect to substantially identical transactions.

26 U.S.C. § 1388(a). "Patronage dividends are payments made to members of a cooperative pursuant to a preexisting legal obligation between the cooperative and its members to the extent that the income distributed is attributable to business done with or for its members and is

8

determined by reference to the organization's net earnings." *Stevenson Co-Ply, Inc. v. Comm'r*, 76 T.C. 637, 644–45 (1981) (citing § 1388(a)).

Of particular relevance here, "[a]n allocation of earnings by a cooperative to its patrons will not qualify as a true patronage dividend unless . . . the allocation [is] made pursuant to a legal obligation which existed at the time the participating patrons transacted their business with the cooperative." *Union Equity Coop. Exch. v. Comm'r*, 58 T.C. 397, 403 (1972), *aff'd*, 481 F.2d 812 (10th Cir. 1973); *see also Smith & Wiggins Gin, Inc. v. Comm'r*, 341 F.2d 341, 350 (5th Cir. 1965) (explaining that "the test is the existence of a legally enforceable obligation to pay patronage refunds which existed during the period when such refunds were earned"); *Am Box Shook Exp. Ass'n v. Comm'r*, 4 T.C. 758, 761 (1945), *aff'd*, 156 F.2d 629 (9th Cir. 1946) (noting that "[i]n order to be a true cooperative, there must be a legal obligation on the part of the [company] to return to the producers, on a patronage basis, all funds received in excess of the cost of the goods sold").

If a cooperative is under an obligation to make refunds through a patronage dividend, that entity need not include the amounts refunded in its gross income. *Petaluma Co-operative Creamery v. Comm'r*, 52 T.C. 457, 465 (1969). Indeed, "[w]hen a legally enforceable obligation exists to refund to qualified purchasers . . . their proportionate share of gross receipts above costs and operating expenses based upon their respective purchases, such receipts are income of the patron and not income of the cooperative and consequently are to be excluded in the computation of the cooperative's gross income." *United States v. Miss. Chem. Co.*, 326 F.2d 569, 570–71 (5th Cir. 1964). In contrast, if the earnings on purchases later distributed are "received by the corporation without a legal obligation, existing at the time of receipt, to refund them to patrons, they [are] considered as gross income of the corporation subject to taxation." *FCX, Inc. v. S.C. Tax Comm'n*, 322 S.E.2d 208, 210 (S.C. Ct. App. 1984).

"The legally enforceable obligation to pay patronage refunds [is] destroyed to the extent the corporation ha[s] discretion to divert net earnings to other purposes." *Id.*; *see also Miss. Chem. Co.*, 326 F.2d at 571 (holding that the legal obligation to pay patronage rebates is extinguished if discretion to divert those funds to pay "common stock dividends or other purpose[s] exists").

The sole issue is whether the CGI Directors had discretion to approve and/or reduce the amount of the Patronage Rebate in September 2016. The Trustee says that they did; the Directors claim that they did not.

At the outset, the Trustee asserts that his complaint contains allegations that the CGI Directors had discretion "over the fact and amount of the [Patronage] Rebate" and that the Court must accept these "allegations" as true for purposes of the Directors' motion to dismiss. (Dkt. 105 at 7.) This contention is erroneous. Although the Court must accept as true all well-pleaded factual allegations in the complaint, *see Killingsworth*, 507 F.3d at 618, whether the Directors had discretion over the approval and amount of the Patronage Rebate is a legal question to be decided by the Court. Thus, the Trustee's conclusory allegations need not be taken as true. *See Iqbal*, 556 U.S. at 678 (explaining that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions").

9

The Trustee offers four other arguments in support of his position that the CGI Directors had discretion over the approval and amount of the Patronage Rebate. All are also without merit.

First, the Trustee argues that the Bylaws establish that the Directors had discretion over the amount of the Rebate. In support, the Trustee points to two particular provisions in the Bylaws. Section 1 of Article XII ("Reserves"), he says, makes clear that the Directors could "set aside reasonable reserves from time to time by resolution" as they deemed "appropriate to provide for any contingencies or expected losses" or as they "otherwise deem[ed] to be in the best interests of the Corporation." (Dkt. 81-1 at 30.) The Trustee also refers to section 2 of Article XII ("Patronage Rebates"), which provides that the amount to be rebated was subject to the "reserves, payment of debts, capital improvements or additions, and working capital requirements" as the Directors could "from time to time determine." (*Id.*)

In interpreting the provisions, the Court must ascertain and effectuate the parties' intent. *Rush Presbyterian-St. Luke's Med. Ctr. v Prudential Ins. Co.,* No. 02 C 0947, 2004 WL 723849, at *3 (N.D. Ill. Mar. 30, 2004). The Court must also read the Bylaws as a whole, giving effect to all of the provisions therein in order to render them consistent with one another. *See Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 527 (7th Cir. 2005); *AGT Crunch Chi., LLC v. 939 N. Ave. Collection, LLC*, No. 07 C 2986, 2008 WL 753951, at *3 (N.D. Ill. Mar. 18, 2008). In doing so, the Court presumes that all parts of the document carry meaning and that no portion was meant to be "mere surplusage." *See Rush Presbyterian-St. Luke's Med. Ctr.,* 2004 WL 723849 at *3.

Turning to the language of the provisions at issue, the Bylaws plainly provide that the CGI Directors were authorized to set aside reasonable reserves "from time to time" and that the payment of the annual patronage rebates was subject to those reserves. Reading section 2 as a whole, however, the Court finds that the provision explicitly establishes that the cooperative was legally obligated to pay the Patronage Rebate and reflects that the drafters of the Bylaws "intended [CGI's] Patronage Rebates [to] qualify as 'patronage dividends'" under § 1388(a) of the Internal Revenue Code. In order to qualify, CGI had to have had a pre-existing obligation to pay the annual rebate at the time Members were making purchases through the cooperative. Accordingly, at the start of fiscal year 2016—on or before August 1, 2015—the CGI Board determined how much of CGI's profit to retain, with the remaining amount to be distributed to Members in good standing as a patronage dividend, based on the amount and type of goods that they bought from CGI over the course of the previous year.[8] Thus, although the Directors had discretion to create reserves, make capital improvements, and protect against future contingencies, they could do so only out of future revenue—for the following fiscal year—so that Members would know, before making purchases from CGI, that a part of their rebates would be used to fund a reserve.

Accordingly, in September 2016, when the CGI Board met to discuss the Patronage Rebate, the amount of the Rebate had already been established, and the Directors had no discretion to

---

[8] The Trustee does not expressly dispute the timing asserted by the Directors—that the Board decided how much of CGI's profit to retain at the beginning of the 2016 fiscal year—and in fact, acknowledges in his complaint that "[t]he amount of each Member's rebate depended on the amount and type of goods that the Member purchased from CGI during the prior year." (Compl. ¶ 36.)

10

divert any of the funds earmarked for Members to other purposes. *See Miss. Chem. Co.*, 326 F.2d at 571 (explaining that lack of board discretion is a characteristic of patronage rebates generally). Had the Directors exercised any such discretion—creating a reserve from earned patronage rebates—the legally enforceable obligation to pay the Rebate would have been destroyed and the diverted funds would have been considered taxable gross income of the cooperative.

Second, the Trustee contends that, as evidence that the Directors had discretion over the amount of the Patronage Rebate, they actually exercised that discretion—by voting to withhold 30% of the Rebate to satisfy CGI's lenders. This argument is specious. Rather than agreeing to reduce the amount of the Patronage Rebate, the Directors elected to hold back 30% of the dividend. According to the Bylaws, the Rebate could be paid at any time within "eight and a half (8 ½) months following the end of the fiscal year"—or, in this case, by April 15, 2017.[9] (Dkt. 81-1 at 30.) Thus, the Directors had discretion to *defer* payment of the Patronage Rebate—not to *reduce* the amount of the Rebate after the funds had been collected.

Third, citing to the minutes from the CGI Board meeting that was held on September 15, 2016 (Dkt. 105-1), the Trustee argues that the Directors did in fact vote on the amount of the Rebate and that if they had no discretion as to the amount, there would have been no reason to vote. Again, the Trustee's argument is misguided. Based on the meeting minutes, the Board did not vote to establish the actual amount of the Patronage Rebate. Rather, the CGI Directors recognized "the financials of the Company," Kubis noted an "anticipate[d]" Rebate of $44.5 million, and the Directors approved the Rebate in that amount, "subject to technical changes after the auditors [had] complete[d] their work." (*Id.*) The formal act of voting on the Rebate was merely ministerial, as the Directors claim; in fact, the right of Members to the Patronage Rebate arose by reason of the corporation's Bylaws and did "not depend upon some corporate action taken subsequent to . . . receipt of the money later so distributed, such as the action of the corporation's officers or directors." *See United Coops., Inc. v. Comm'r,* 4 T.C. 93, 106 (1944).

Finally, the Trustee argues that the CGI Directors are "wrong on [the] federal tax law." The Trustee acknowledges that, in order to qualify for tax-exempt status, a patronage dividend must be paid pursuant to a pre-existing legal obligation of the cooperative. But this requirement, he says, does not preclude the cooperative from setting aside some money from its income to guard against future contingencies, nor does it render the distributed portion of the funds subject to income tax. In support of his position, the Trustee cites to *United Cooperatives, Inc. v. Commissioner*, 4 T.C. 93 (1944).

That case involved an agricultural cooperative, whose bylaws provided for the distribution of a patronage refund based on the net income remaining after payments to a reserve for depreciation, in an amount that was to be determined by the cooperative's directors. *Id.* at 94–95, 99–101. Solely at issue was whether the refund distributed by the cooperative to its patrons was included in its gross income. *Id.* at 94. The court concluded that the establishment and maintenance of the depreciation reserve was a "proper operational expense" that would have been subtracted from the entity's gross income, even though the bylaws did not expressly provide as such. *Id.* at

---

[9] After the Board agreed to withhold part of the Patronage Rebate, CGI sent letters to its Members, explaining that 30% of each Member's Rebate would be credited against future purchases. (Dkt. 121 at 2, n.3, Exs. A & B.)

11

108. Thus, the depreciation reserve was an expense of the cooperative, which could be excluded from the patronage refund just as other expenses were.

In contrast, the Trustee here suggests that the CGI Directors should have retained a portion of the Patronage Rebate to improve the financial position of CGI and/or its subsidiaries. Any such funds that the Directors would have retained would not have constituted an operational expense like the one in *United Cooperatives* and, instead, would have been included in CGI's gross income, subject to taxation.

In sum, the Court finds that the Trustee has failed to establish that the CGI Directors had discretion over the approval or amount of the Patronage Rebate. That Rebate, as others like it, had unique characteristics. CGI had to become legally obligated to pay the Rebate before its Members transacted business with the cooperative. And, because of that pre-existing obligation, the CGI Directors lacked any discretion to divert the Patronage Rebate funds for other purposes. As the Directors explain, the primary purpose of a cooperative is to provide patronage rebates on purchase. Thus, retaining profits—rather than remitting them to patrons—is "antithetical to the fundamental principal of cooperatives: Cooperatives do not retain profits." (Dkt. 81 at 12.)

Based on the nature of cooperatives, the documents at issue here, the arguments of the parties, the relevant statutes and caselaw, and the particular circumstances discussed above, the Court concludes that the CGI Directors had no discretion over the approval or amount of the Patronage Rebate in September 2016 and, as such, owed no fiduciary duties to CGI in connection with the payment of the Rebate. Accordingly, the motion to dismiss Count 18 is granted, and that count is dismissed with prejudice.

### Count 19 – Improper Distribution Pursuant to 805 ILCS 5/9.10
### (against the CGI Directors)

In Count 19 of the complaint, the Trustee alleges that payment of the Patronage Rebate constitutes an improper distribution to shareholders under § 9.10 of the Illinois Business Corporation Act of 1983 (the "BCA"). 805 ILCS 5/9.10. According to the Trustee, the CGI Directors approved the Rebate when the cooperative either was insolvent or was rendered insolvent by that payment. As a result, the Trustee says, CGI was damaged by the improper distribution, and the Directors are jointly and severally liable to CGI for the amount of the distribution under § 9.10 of the BCA.

That statute provides, in pertinent part, as follows:

> § 9.10. Distributions to shareholders. (a) The board of directors of a corporation may authorize, and the corporation may make, distributions to its shareholders, subject to any restrictions in the articles of incorporation and subject also to the limitations of subsection (c) of this Section.

\* \* \*

> (c) No distribution may be made if, after giving it effect:
>
> (1) the corporation would be insolvent; or
>
> (2) the net assets of the corporation would be less than zero or less than the maximum amount payable at the time of distribution to shareholders having preferential rights in liquidation if the corporation were then to be liquidated.

805 ILCS 5/9.10. Section 9.10 prohibits corporations from making any "distributions to shareholders" when the corporation either is insolvent or would be rendered insolvent by those distributions. *Id.* The purpose of the statutory provision is to prevent corporations from disbursing their assets to shareholders, thereby leaving creditors unpaid. *See In re Winer*, 158 B.R. 736, 746 (N.D. Ill. 1993) (explaining that "any shareholder right to receive corporate assets can come only after the claims of corporate creditors have been satisfied or provided for" pursuant to § 9.10 of the BCA); *Se. Health Care Facilities, Inc. v. Payton Health Care Facilities, Inc.*, No. 87 C 0429, 1988 WL 53183, at *3 (N.D. Ill. May 13, 1988) (requiring proof that a distribution depleted assets, thus impairing creditors' rights or rendering the company insolvent).

Section 9.10 of the BCA does not govern patronage rebates because such rebates are not "distributions to shareholders." As the Directors indicate, none of the reported decisions applying § 9.10 involve patronage rebates, which are markedly different from "distributions to shareholders," such as dividends and stock redemptions, in many important respects. As discussed above, patronage rebates, unlike dividends and stock redemptions, are refunds to patrons, based on the amount of each patron's purchases from the cooperative. *Allied Supermarkets, Inc. v. Grocer's Dairy Co.*, 206 N.W.2d 490, 493 (Mich. Ct. App. 1973) (explaining that "[r]efunds differ from dividends because the former are not distributions of income"), *aff'd,* 219 N.W.2d 55 (Mich. 1974). Accordingly, patronage rebates are neither allocated by stock ownership nor limited to stock owners. In fact, section 10 of Article XII of CGI's Bylaws emphasizes the distinction between dividends and redemptions on the one hand and patronage rebates on the other by providing that the Board of Directors' determinations of cash available for dividends and redemptions "shall not affect Patronage Rebates for any year." (Dkt. 81-1 at 33.)

Moreover, patronage rebates do not represent a distribution of a cooperative's own assets, but, rather, the assets of its patrons. Indeed, patronage rebates are not included in a cooperative's gross income for tax purposes because the cooperative is seen merely as a conduit or trustee for the rebates, which "are at all times the property of the [cooperative's] member[s]" or patrons. *Columbus Fruit & Vegetable Coop. Ass'n, Inc. v. United States*, 7 Cl. Ct. 561, 564 (1985) (internal quotation omitted) (explaining that "[t]he money involved never belongs to the cooperative"); *see also Cessna v. Rea Energy Coop., Inc.*, No. 3:16-42, 2016 WL 3963217, at *1 (W.D. Pa. July 21, 2016) (holding that "[b]ecause the Patronage Capital does not become Defendant's property, Defendant acts merely as the agent or trustee of the members to account for the Patronage Capital that belongs to them"); *Affiliated Foods, Inc. v. Comm'r*, 128 T.C. 62, 85 (2007) (explaining that "[u]nder the so-called agency theory, the cooperative should never be taxed because it is conceived of as an agent, bailee, or trustee for the patrons, serving merely as a conduit for their income which it does not own" (internal quotation omitted)).

For the reasons discussed above, the Court finds that the Patronage Rebate is not a "distribution to shareholders" as required under § 9.10 of the BCA. As such, the Trustee has not pleaded that such a distribution was made and, accordingly, has failed state a claim upon which relief can be granted under § 9.10. Because no such claim can be stated under any of the facts in this matter, Count 19 is dismissed with prejudice.

**Count 20 – Breach of Fiduciary Duties Related to Underfunded Buying Deposit Accounts
(against the CGI Directors, Nemeth, and Kubis)**

In Count 20, the Trustee alleges that the Defendants, as board members or officers of CGI, had fiduciary duties to the cooperative that they breached by failing to require—or to take any significant steps to require—CGI Members to maintain their Buying Deposit accounts in accordance with the corporation's Bylaws, Rules and Regulations, and membership applications. According to the Trustee, many of the Directors had a "personal motive" for allowing the Buying Deposit accounts to become underfunded, as a lot of the stores that they owned or managed were deficient in fulfilling their own Buying Deposit requirements. (Compl. ¶ 226.) The Trustee asserts that, as a direct and proximate result of their breaches of fiduciary duty, the Defendants caused CGI to suffer at least $8.46 million in damages in connection with the failure of CGI Members to pay the amounts that they owed to CGI.

In response, the Defendants argue that they were generally responsible for only significant and fundamental corporate decisions—not for the day-to-day management of the cooperative, such as the maintenance of Members' Buying Deposits accounts. They also contend that Count 20 is fatally defective because it lacks adequate factual content to state a plausible claim upon which relief can be granted.

Section 8 of Article XII of the Bylaws provides, in relevant part, as follows:

> Each Member, Patron or Customer, upon becoming a Member, Patron or Customer, respectively, shall be required to deposit with the Corporation an amount fixed by the Rules and Regulations. In addition, each Member, Patron or Customer shall maintain with the Corporation Buying Deposits in an amount at least equal to the greater of (a) an amount fixed by the Rules and Regulations or (b) two (2) times such Person's average weekly purchases (such average determined over the preceding sixty (60) days) . . . . The Corporation shall issue weekly statements to each Member, Patron or Customer evidencing such Member, Patron or Customer's Cash Deposits.

(Dkt. 81-1 at 32–33.) According to CGI's Rules and Regulations, existing Members could meet their Buying Deposit requirements in one of the two following ways:

> Full deposit requirement [*sic*] must be satisfied within two years. This rule contemplates that either 80% of Members['] vested "B" stock value (net of any outstanding Member loans) is sufficient, or consideration

> that the Members['] existing stores are fully deposited and acceptable ACH history.

(Compl. ¶ 99.[10])

Although the Trustee generally asserts that the Defendants owed CGI the fiduciary duties of care, good faith, and loyalty, he argues primarily that, by failing to enforce the Buying Deposit requirements under the Bylaws and Rules and Regulations, the Defendants breached their duty of oversight in the funding and maintenance of the deposit accounts, as well as their duty of loyalty, enhancing their own personal interests at the expense of CGI's. The Court will address each argument in turn.

As to the oversight claim, directors and senior officers generally "are not responsible for the day-to-day running of the corporation." *Kennedy v. Venrock Assocs.*, 348 F.3d 584, 592 (7th Cir. 2003); *see also In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 968 (Del. Ch. 1996) (finding that the board of directors is "required only to authorize the most significant corporate acts or transactions"); *Zahl v. Krupa*, 927 N.E.2d 262, 289 (Ill. App. Ct. 2010), *abrogated on other grounds by Doe v. Coe*, 135 N.E.3d 1 (Ill. 2019). Rather, directors typically "entrust to subordinate . . . officers the discretionary powers which usually and ordinarily appertain to the immediate management of the particular business." *Lowell Hoit & Co. v. Detig*, 50 N.E.2d 602, 603 (Ill. App. Ct. 1943).

Directors can be held liable for mistakes made by subordinates only if they have knowledge that the mistakes are pervasive and they wittingly fail to take preventative or corrective action. "Where . . . director oversight liability is alleged, the plaintiff must establish that (1) the directors utterly failed to implement any reporting or information system or controls; or (2) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *In re Huron Consulting Grp., Inc. S'holder Derivative Litig.*, 971 N.E.2d 1067, 1083 (Ill. App. Ct. 2012) (internal quotations omitted). "Under either scenario, the imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations." *Id.* (internal quotations omitted). "A breach of fiduciary duty exists only where the directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities." *Id.* (internal quotations omitted). Thus, director oversight liability is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment because it attempts to hold directors personally liable for the bad acts of [the company's] employees." *Id.* (internal quotations omitted).

Here, there are no allegations in the Trustee's complaint to suggest that the Defendants had a fiduciary duty to oversee and otherwise police the maintenance of the Buying Deposit accounts. If such a duty existed, however, it was met through CGI's Buying Deposit system, which was designed to ensure that the cooperative was always paid for products that were purchased. Despite the creation and implementation of that system, the Trustee attempts to allege—through two lines

---

[10] The Court was not given a copy of CGI's Rules and Regulations, nor were any of the cooperative's membership applications provided. For purposes of this motion to dismiss, the Court takes as true the Trustee's allegations regarding the provision about Buying Deposits in the Rules and Regulations.

of argument—that the Defendants knew that they were not discharging their fiduciary obligations or were otherwise consciously disregarding their responsibilities in connection with the monitoring of the Buying Deposit accounts.

First, the Trustee alleges that CGI allowed Members to meet their Buying Deposit requirements through their Class B share holdings and that one way to address the shortfall between the unpaid accounts receivable and the actual cash deposits was through the use of these shares. (Compl. ¶ 101.) According to the Trustee, CGI calculated the value of Members' Class B shares—for purposes of their Buying Deposit accounts—based on the value of the shares at the time they were issued. (*Id.*) As a result, the Trustee says, the shares were "grossly overvalued"—and the Defendants knew that they were—"long before CGI entered bankruptcy." (*Id.*) With that knowledge, the Trustee argues, the Defendants should have made "particularly aggressive efforts" to ensure that the Buying Deposit requirements were satisfied. (*Id.*)

Despite these allegations, the Trustee fails to offer any facts—aside from those asserting that the Defendants knew that CGI was in serious financial trouble in the fall of 2016—to link their knowledge of the value of the Class B shares to any conscious failure to monitor the Buying Deposit accounts. The Trustee's claim that the Defendants "failed to act to protect CGI from the changing circumstance of the elimination of the value of the Class B shares" (Dkt. 105 at 23) misses the mark, as it is unclear whether their purported knowledge should have prompted them to take certain action with respect to the Buying Deposits or whether they even had the authority to do so.

Second, in trying to allege that the Defendants had knowledge of pervasive problems in connection with the Buying Deposit accounts, the Trustee contends that at least eight CGI Directors owned stores with underfunded accounts. (Compl. ¶¶ 104–05.) Whether individual stores were meeting the Buying Deposit requirements, however, is not the appropriate inquiry. Section 8 of Article XII of the Bylaws provides that the adequacy of the deposit accounts is determined at the Member level—not the store level—and thus depends on the aggregate deposits of a Member's affiliated stores. (Dkt. 81-1 at 32–33.) Accordingly, even if some of a Director's individual stores had inadequate deposits, the stores in the aggregate could be satisfying the requirements or even overfunding their accounts, and thus the Director would have no knowledge that there were any funding problems.[11]

In sum, the Trustee has failed to sufficiently allege that the Defendants had a duty to oversee the funding of the Buying Deposit accounts. CGI implemented a system to manage the funding of those accounts, and there are no factual allegations in the complaint to adequately support the Trustee's contention that the purported problems with the accounts were so severe or widespread that the Defendants must have known about them or that they knew that they were not discharging their fiduciary obligations.

---

[11] Without authority or explanation, the Trustee suggests in his response that the issue of individual store underfunding is not appropriately decided in a motion to dismiss, asserting that the Defendants will have an opportunity to address the question either at the summary judgment stage or at trial. (Dkt. 105 at 27.) The Trustee raises and discusses the underfunding at the store level, however, as a basis for his allegations of both knowledge and loyalty; thus, the issue is properly considered here.

Turning to the Trustee's loyalty claim, under Illinois law, officers and directors owe a fiduciary duty of loyalty to their corporate employer and "may not enhance their personal interests at the expense of the corporation's interest." *Krol v. Wilcek (In re H. King & Assocs.)*, 295 B.R. 246, 274 (Bankr. N.D. Ill. 2003); *see also Foodcomm Int'l v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003) (explaining that the duty of loyalty prohibits agents from "actively exploit[ing] their positions within the corporation for their own personal benefits"); *Danaher Corp. v. Gardner Denver, Inc.*, Case No. 19-CV-1794-JPS, 2020 WL 2557744, at *13 (E.D. Wis. May 20, 2020) (same); *Beltran v. Brentwood N. Healthcare Ctr., LLC*, 426 F. Supp. 2d 827, 831 (N.D. Ill. 2006). Specifically, officers and directors should not put themselves "in a position where their own individual interests might interfere with the performance of their duties to the corporation," and they should "not use their positions for their own personal gain." *H. King & Assocs.*, 295 B.R. at 274 (internal quotations omitted).

Here, the Trustee contends that the Defendants breached their duty of loyalty by "acting in their own self-interest and with a purpose other than that of advancing CGI's best interests" with respect to the maintenance of the Buying Deposit requirements. (Compl. ¶ 224.) According to the Trustee, the Defendants breached this duty by failing to require, or to take any critical steps to require, all Members to maintain their deposit accounts, a "particularly significant" failure, given that the value of CGI's Class B shares had declined, leaving the cooperative "woefully unprotected." (*Id.* ¶ 225.) At the same time, the Trustee alleges that "[m]any of the CGI Directors" had a "personal motive" for failing to require Members to maintain their Buying Deposits, as "many of the stores [that] they owned or managed were deficient in fulfilling their own Buying Deposit[] requirements." (*Id.* ¶ 226.)

The Trustee's allegation that the Defendants failed to require adequate funding in the Buying Deposit accounts of all Members—not just those of their own stores—thwarts the validity of his loyalty claim. Any personal interest that the Directors would derive from not being required to fund the accounts of their stores would be equally shared by all other Members. Thus, the Directors would not be exploiting their positions solely for their own personal gain by failing to enforce the funding requirements, and that failure would not be considered a breach of the fiduciary duty of loyalty.

As for his allegations regarding particular Directors who had inadequately funded Buying Deposit accounts, the Trustee has not identified any specific Director and/or store, alleged when and how long the accounts were underfunded, or provided any of the individualized calculations to assess the adequacy of the accounts. As such, the Trustee has failed to state a claim upon which relief may be granted. The Court also notes that, although some of the Directors' stores may have been in violation of the Buying Deposit requirements, such violation would make those Directors responsible for the amounts owed to CGI, not for the shortfall resulting from the underfunding of all Members' accounts.

For all of the foregoing reasons, the Court finds that Count 20 of the complaint does not state a cause of action for breach of fiduciary duty with respect to the Buying Deposits and is, therefore, dismissed without prejudice. The Trustee is given leave to replead Count 20, to the extent that he can do so consistent with this ruling.

17

**Count 21 – Equitable Subordination Pursuant to § 510(b)
(against Cortesi, Dremonas, Ingraffia, Kamberos, Kotara, Lagastee,
Lee, Linares, Presta, Regas and Robertson[12])**

In Count 21, the Trustee alleges that eleven claims scheduled on behalf of Cortesi, Dremonas, Ingraffia, Kamberos, Kotara, Lagestee, Lee, Linares, Presta, Regas, and Robertson (collectively, the "Claimants") for $1,500 each, as well as four claims totaling $285,644 filed on behalf of Robertson,[13] should be equitably subordinated pursuant to § 510(c) of the Bankruptcy Code. According to the Trustee, the Claimants engaged in "inequitable conduct with respect to CGI," and that conduct injured CGI and its creditors and also provided the Claimants "with an unfair advantage or benefit, including a substantial patronage rebate." (*Id.* ¶ 230.)

To plead a claim of equitable subordination under § 510(c), a complaint must include factual allegations about each of three elements: (1) whether the claimant engaged in inequitable conduct; (2) whether that misconduct resulted in injury to other creditors or an unfair advantage to the claimant; and (3) whether subordination of the debt is inconsistent with other provisions of the Bankruptcy Code. *In re Vitreous Steel Prods. Co.*, 911 F.2d 1223, 1237 (7th Cir. 1990). The question of whether to equitably subordinate a claim must be made on a case-by-case basis, with a focus on fairness to other creditors. *Id.*

Rather than providing any factual allegations in Count 21, the Trustee merely recites the elements of a claim for equitable subordination. Indeed, other than a passing reference to the Claimants' purported misconduct that gave them "an unfair advantage or benefit, including a substantial patronage rebate," the Trustee does not specify the inequitable conduct required for equitable subordination, nor does he offer any allegations about the two other elements under § 510(c). Instead, he simply "re-alleges the allegations set forth in the above paragraphs." (Compl. ¶ 228.)

The Claimants challenge the sufficiency of the form of Claim 21, arguing that the Trustee has engaged in what is known as "shotgun pleading." Because it fails to include any of its own allegations, the Claimants say, Count 21 does not put them on notice as to exactly which conduct is at issue, and thus that count must be dismissed.

"Shotgun pleading" is a tactic in which each count incorporates by reference all of the paragraphs of the counts preceding it. *S.E.C. v. Ustian*, 229 F. Supp. 3d 739, 778 (N.D. Ill. 2017). Although Federal Rule 10(b) allows incorporation by reference, Fed. R. Civ. P. 10(b) (made applicable by Fed. R. Bankr. P. 7010), shotgun pleading often results in a document that is lengthy, confusing, and unwieldy, because the incorporation of many previous allegations can make it "virtually impossible" to determine which allegations correspond to which count. *CustomGuide v. CareerBuilder, LLC*, 813 F. Supp. 2d 990, 1001 (N.D. Ill. 2011). In the Seventh Circuit, a shotgun pleading may be dismissed if its inclusion of superfluous material frustrates both notice of the

---

[12] Count 21 is asserted against all of the CGI Directors except Dal Pra and Sullivan.

[13] The claims at issue—Nos. 1139, 1145, 1181, and 1188—were filed on behalf of Robertson as successor in interest to 926 E. 9th St. Corp., a dissolved corporation. (Compl. ¶ 229(l).)

plaintiff's claim and the defendant's understanding of the allegations. *Stanard v. Nygren*, 658 F.3d 792, 797 (7th Cir. 2011); *United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003).

In support of his equitable subordination claim in this matter, the Trustee does not specify in Count 21 the alleged misconduct that each of the Claimants engaged in. Some or all of the Directors against whom Count 21 is asserted are also named in prior Counts 1, 2, 3, 8, 18, 19, and 20, as well as in Counts 22–32. Because the Trustee generally refers to a "patronage rebate" in Count 21, it is likely that that breach of fiduciary duty allegations related to the Patronage Rebate in Counts 18 and 19 are the "inequitable conduct" that is alleged. It is unclear, however, whether the allegations in the other counts against some or all of the Claimants—or, for that matter, the allegations in the incorporated counts that do *not* name the Claimants—also serve as the basis for the Trustee's claim of equitable subordination.

Accordingly, the incorporation of all of the allegations set forth in the paragraphs preceding Count 21 significantly hinders the understanding of the pleading. *See Chriswell v. Vill. of Oak Lawn*, No. 11 C 00547, 2013 WL 5903417, at *5 (N.D. Ill. Nov. 4, 2013), *aff'd sub nom. Chriswell v. O'Brien*, 570 F. App'x 617 (7th Cir. 2014); *see also Gierum v. Glick (In re Glick),* 568 B.R. 634, 671 (Bankr. N.D. Ill. 2017); *Van Dyke Ford, Inc. v. Ford Motor Co.*, 399 F. Supp. 277, 285 (E.D. Wis. 1975). Neither the Court nor the Claimants should have to speculate about which allegations are applicable to Count 21. *See Garst*, 328 F.3d at 378 (explaining that pleadings should be straightforward because judges and adverse parties "have better things to do" than "try[ing] to fish a gold coin from a bucket of mud"). The Trustee's shot-gun pleading and his "[t]hreadbare recital" of the elements of equitable subordination, "supported by mere conclusory statements," do not put the Claimants on notice of the Trustee's claim against them. *See Iqbal*, 556 U.S. at 678.

As such, the Trustee has not sufficiently pleaded a cause of action for equitable subordination in Count 21, and that count is dismissed without prejudice. The Trustee is given leave to replead Count 21 consistent with this ruling.

### Counts 22–32 – Objections to Claims
### (against Cortesi, Dremonas, Ingraffia, Kamberos, Kotara, Lagastee, Lee, Linares, Presta, Regas and Robertson)

Finally, Counts 22–32 are separate objections to each of the $1,500 claims that were scheduled on behalf of the same Claimants in Count 21. The Trustee alleges that the claims (1) should be equitably subordinated pursuant to § 510(c), and (2) are subject to setoff, recoupment, and/or withholding pursuant to § 502(b)(1), based on the causes of action asserted against each of the Claimants in the complaint. Once again, the Trustee does not specify the causes of action that allegedly form the basis of his objections.

As a result, and for the same reasons discussed above, Counts 22–32 are dismissed for failure to state claims upon which relief can be granted. This dismissal is also without prejudice, and the Trustee may replead these counts, if he chooses to do so, consistent with this ruling.[14]

## CONCLUSION

For the foregoing reasons, the Court grants the Defendants' motion to dismiss as to all counts in the Trustee's complaint. Counts 18 and 19 are dismissed with prejudice. Counts 20–32 are dismissed without prejudice, and the Trustee may replead those counts consistent with this order. A status hearing will be held on December 15, 2021 at 2:00 p.m. at which time the Court will discuss with the parties a schedule in connection with the filing of a potential amended complaint and the responsive pleadings thereto.

**DATE:** November 9, 2021     **ENTER:**

_Janet S. Baer_
Janet S. Baer
United States Bankruptcy Judge

---

[14] The Claimants contend that the schedules control over any conflicting allegations in the complaint and that, in scheduling the claims, CGI acknowledged that none of them was contingent, disputed, or subject to setoff. Relying on *Peterson v. McGladrey & Pully, LLP,* 676 F.3d 594, 596 (7th Cir. 2012), the Claimants argue that, accordingly, the Trustee has failed to state any basis for his objections because, in collecting property of the estate, he steps into the shoes of CGI, making his claims subject to the same defenses that CGI could have asserted had the cooperative filed suit itself.

In *Peterson*, the chapter 7 trustee of bankrupt mutual funds filed an action against the funds' auditor for professional negligence based on its failure to discover fraud. *Id.* at 596. Among other things, the Seventh Circuit focused on the defense of *in pari delicto*, a doctrine pertinent to situations in which the plaintiff is a participant in misconduct giving rise to the claim, making him "as culpable as the defendant, if not more so." *Id.; see also Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985) (noting that the common-law defense comes from the Latin "*in pari delicto potior est conditio defendentis*," which means "[i]n a case of equal or mutual fault . . . the position of the [defending] party . . . is the better one" (internal quotations omitted)). Because the circumstances and issues in *Peterson* are substantially different from those in the matter at bar, the case is not applicable.

Rather, the issue here is whether the schedules filed in CGI's bankruptcy case constitute judicial or evidentiary admissions by the Trustee. The Court finds that they do not. Although scheduled claims may be admissions by the debtor, they are not admissions by the trustee and have no evidentiary value against him. *Am. Express Bank v. eCast Settlement Corp. (In re Plourde),* 418 B.R. 495, 505 n.13 (B.A.P. 1st Cir. 2009); *Caplan v. B-Line, LLC (In re Kirkland)*, 572 F.3d 838, 840–41 (10th Cir. 2009); *In re Burkett*, 329 B.R. 820, 829 (Bankr. S.D. Ohio 2005) ("Of course, a debtor's scheduling of a debt does not constitute an admission by the trustee . . . ."); *In re Jorczak*, 314 B.R. 474, 482–83 (Bankr. D. Conn. 2004) (explaining that scheduling of a claim constitutes an admission binding on the debtor but not the trustee). Accordingly, the Claimants' argument that Counts 22–32 should be dismissed based on the information in CGI's schedules is without merit.